1  LONGYEAR, O'DEA & LAVRA, LLP
   John A. Lavra, CSB No.: 114533
2  Kelley S. Kern, CSB No.: 221265
   3620 American River Drive, Suite 230
3  Sacramento, CA 95864
   Phone: 916-974-8500
4  Facsimile: 916-974-8510

5  **Attorneys for County of Sacramento**

6           **UNITED STATES DISTRICT COURT**

7       **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8  CALIFORNIA FOUNDATION FOR          )   **CASE NO:  2:12-CV-03056-KJM-GGH**
   INDEPENDENT LIVING CENTERS, on behalf )
9  of itself and others similarly situated, and )   **DEFENDANT COUNTY OF**
   RUTHEE GOLDKORN, on behalf of herself and )   **SACRAMENTO'S MEMORANDUM OF**
10 others similarly situated,          )   **POINTS AND AUTHORITIES IN**
                                       )   **SUPPORT OF ITS MOTION FOR**
11          Plaintiff                  )   **PARTIAL SUMMARY JUDGMENT**
                                       )
12     vs.                             )
                                       )   **DATE:**    May 22, 2015
13 COUNTY OF SACRAMENTO,               )   **TIME:**    10:00 a.m.
                                       )   **CTRM:**    3
14          Defendant.                 )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................1

II.  STANDARD FOR SUMMARY JUDGMENT .....................................2

III. STATEMENT OF FACTS ...................................................................2

      A.  Design and Construction of the Gate Counters.............................3

      B.  Emergency Evacuation Procedures for Terminal B .......................6

IV.  LEGAL ARGUMENT.........................................................................9

    A.   SUMMARY JUDGMENT IS APPROPRIATE FOR DEFENDANT AS
        TO THE GATE COUNTERS....................................................9

        1.   Summary Judgment for Defendant on the First Cause of Action is
            Appropriate Because the Gate Counters in Terminal B are
            Compliant with the 1991 ADAAG ...............................9

        2.   Summary Judgment for Defendant on the Second Cause of Action
            is Appropriate Because Defendant Did Not Receive Federal
            Funding for Terminal B and the Gate Counters are Compliant with
            the 1991 ADAAG and Thus, Do Not Violate the Rehabilitation
            Act.......................................................................12

            A.  Defendant Did Not Receive Federal Funding for the Design,
               Construction, Operation or Maintenance of Terminal B, and
               Thus Plaintiffs Cannot Maintain a Cause of Action under
               Section 504 ..............................................................12

            B.  The Gate Counters in Terminal B are Compliant with the 1991
               ADAAG and Thus, Do Not Violate Section 504 ...................12

        3.   Defendant is entitled to Summary Judgment on the Third Cause of
            Action Because the Gate Counters do not Violate the Unruh Civil
            Rights Act ...............................................................13

        4.   Summary Judgment for Defendant on the Fourth Cause of Action
            is Appropriate Because the County Has Not Violated California
            Disabled persons Act ..................................................14

        5.   Defendant is Entitled to Summary Judgment on the Fifth Cause of
            Action because Defendant does not Receive any State Funding for
            Any Programs or Activities in Terminal B and The County Has
            Not Violated California Government Code § 11135 ................14

    B.   SUMMARY JUDGMENT IS APPROPRIATE FOR DEFENDANT AS
        TO THE EMERGENCY EVACUATION PROCEDURES .....................15

        1.   Plaintiffs Lack Standing to Bring Claims Related to the Emergency
            Evacuation Procedures in Terminal B .............................15

        2.   Summary Judgment is Proper on Every Cause of Action as They
            Relate to the Emergency Evacuation Plans for Terminal B .......17

i

C.      Defendant is Entitled to Summary Judgment on the Sixth Cause of Action
        because Defendant has Not Violated Federal or State Law With Respect to
        Its Gate Counters or Emergency Evacuation Plans .....................................18

V. CONCLUSION ...........................................................................................................19

## TABLE OF AUTHORITIES

**CALIFORNIA STATUTES**

California Government Code § 11135 ....................................................................1, 14, 18

Cal. Civ. Code § 51 ................................................................................................13

Cal. Civ. Code §54(a) ............................................................................................13

Cal. Civ. Code. § 54.1 ...........................................................................................14

Cal. Civ. Code. § 54(c) ..........................................................................................14

**CALIFORNIA REGULATIONS**

2007 California's Building Code, Title 24, Part 2, Chapter 11B  § 1122B.5 ..............................13

2007 California's Building Code, Title 24, Part 2, Chapter 11B  §1121B.4.1.3 ........................13

**FEDERAL STATUTES**

42 U.S.C. § 12132 .................................................................................................10

29 U.S.C. § 794......................................................................................................12

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) ...............................................................................................2

Fed. R. Civ. P. 56(c) ..............................................................................................2

**FEDERAL REGULATIONS**

28 C.F.R. § 35.149.................................................................................................10

28 C.F.R. § 35.150(a)............................................................................................17

28 C.F. R. § 35.151(c)...........................................................................................10

28 C.F.R. pt. 36, App. D § 2.2 ..............................................................................11

28 C.F.R. pt. 36, App. D §7.2 ...............................................................................11

28 C.F.R. part 36 § 904.4 ......................................................................................11

**FEDERAL CASES**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)...........................................2

Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983).............................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brooklyn Center for Independence of the Disabled v. City of New York, 980
F.Supp.2d 588, 641-642 (S.D.N.Y. 2013) ...................................................17, 18

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ..............................................2

City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983) ........................................15

Clapper v. Amnesty Int'l USA,  U.S.   ,   , 133 S.Ct. 1138, 1147, 2013 U.S.
LEXIS 1858 (2013)................................................................................................15

Davis v. Federal Election Comm'n, 554 U.S. 724, 734 (2008)..............................15

D.K. v. Solano County Office of Educ., 667 F. Supp. 2d 1184, 1190-91 (E.D. Cal.
2009) (England, J.)................................................................................................14

Human Life of Wash., Inc. v. Brumsickle, 624 F.3d 990, 1000 (9th Cir. 2010).........15

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (343 (1977) .................16

Los Angeles v. Lyons, 461 U.S. 95, 109 (1983).............................................15, 16

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) ..............................15

Melendres v. Arpaio, 695 F.3d 990, 997 (9th Cir. 2012)  ...................................16

Midgett v. Tri-Cnty. Metro. Transp. Dist. of Or., 254 F.3d 846, 851 (9th Cir. 2001)................18

Montana Shooting Sports Ass'n v. Holder, 727 F.3d 975, 979 (9th Cir. 2013).............15, 16

PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001) .........................................10

Pierce v. County of Orange, 519 F.3d 985, 1010 n.27 (9th Cir. 2008)....................13

Simo v. Union of Needletrades, 322 F.3d 602, 609-10 (9th Cir. 2003) ..................2

Sprint Commc'n Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273-74, (2008)  ....................15

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-104 (1998) .......................15

Texas v. United States, 523 U.S. 296, 300 (1998)................................................16

Weinreich v. Los Angeles County Metro. Trans. Auth., 114 F.3d 976, 978 (9th Cir.
1997) ....................................................................................................................10

Vinson v. Thomas, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002) .................................12

## I.    **INTRODUCTION**

In the spring of 2008, the County of Sacramento ("County") began construction on a state of the art addition to the Sacramento International Airport in the form of a newly constructed Terminal B. The County contracted with qualified and nationally recognized architects and building contractors to design and construct Terminal B. The County and its agents paid consideration to the applicable federal and state building requirements for disability access, such as the 1991 Americans with Disabilities Act Accessibility Guidelines and the 2007 California Building Code. The building plans and specifications were reviewed by the County Building Department before construction began, which then issued Certificates of Occupancy for the terminal at the completion of construction, indicating compliance with the accessibility requirements for the Terminal.

Despite compliance with federal and state access requirements, Plaintiffs have alleged Defendant violated Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, California's Unruh Civil Rights Act, California's Disabled Persons Act and California Government Code § 11135 *et seq.* by denying Plaintiffs the benefits of the facilities, services, and programs of Terminal B, based on Plaintiffs' use of a wheelchair or scooter due to a mobility disability. (See Plaintiffs' Complaint, attached to the Declaration of Kelley S. Kern, **Exhibit A**). The parties negotiated and have reached a tentative settlement on all issues raised in the Complaint, with the exception of the counters on the concourse side of Terminal B (referred to herein as "gate counters") and issues regarding the emergency evacuation procedures and plans (referred to herein as "Emergency Evacuation Plan" or "EEP"). This motion addresses only those two remaining issues.

Plaintiffs Ruthee Goldkorn ("Goldkorn") and California Foundation for Independent Living Centers ("CFILC") assert the gate counters in Terminal B do not meet relevant design and construction standards for accessibility applicable to newly-constructed or altered facilities. Plaintiffs also assert that the County lacks an Emergency Evacuation Plan for Terminal B that provides for the needs of Plaintiffs in an emergency. However, Plaintiffs' claims are without merit and Defendant denies that it violated the law with respect to disability access. Defendant afforded Plaintiffs the benefits of the facilities, services, and programs of Terminal B as required under federal and state law. Additionally, several of the statutes under which Plaintiffs seek recovery do not apply because the County did not received federal or state

funding for the design, construction, operation or maintenance of the Terminal buildings involved in this litigation. Finally, Plaintiffs lack standing to bring any claim related to the County's Emergency Evacuation Plan.  For these reasons, summary judgment should be granted for the County.

## II.    STANDARD FOR SUMMARY JUDGMENT

On a motion for summary judgment, the Court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact. Fed. R. Civ. P. 56(c); see also Simo v. Union of Needletrades, 322 F.3d 602, 609-10 (9th Cir. 2003). Summary judgment may be granted on each claim or a "part of each claim or defense" in a case. Fed. R. Civ. P. 56(a). Summary judgment against a party is appropriate when the depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The moving party bears the initial burden of establishing the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

## III.    STATEMENT OF FACTS

Sacramento International Airport is operated by the County of Sacramento, a local government entity.   (Undisputed Material Fact ("UMF") No. 1).  In 2008, the County began construction of a new Terminal B.   (UMF No. 2).  Terminal B was contemplated, designed and built as a program, which includes, but is not limited to, physical structures as well as systems related to infrastructure, TSA, baggage handling, roadways, parking and air traffic.  (UMF No. 3).  The program also included design and construction of the actual terminal, as well as the concourse.[1]  (UMF No. 4).

---

[1] For purposes of this motion, when the term "Terminal B" is used, it relates to two buildings in the program:  (1) the terminal (the landside building of the terminal), which is used for purchasing tickets, checking and retrieving baggage and transportation to and from the airport, and (2) the concourse (the air side of the terminal) which houses the airlines and the arrival and departure of flights.

Funding for the program was provided from numerous sources, each of which specified which portions of the program should receive the funding.   (UMF No. 5). The complete program was funded by a combination of funding from the FAA, Passenger Facility Charges (PFC), Bond Proceeds from revenue bonds, American Recovery and Reinvestment Act of 2009 (ARRA) Stimulus Funding, Retained Earnings- Capital Improvement and an FAA grant.  (UMF No.  6).  All federal funds identified above were allocated to specific elements of the airport, which do not include the buildings, such as the taxiways, runways, baggage handling systems, and environmental impact studies. (UMF No. 7). No federal or state funds were used for the design, construction, operation or maintenance of either building identified in this litigation as "Terminal B". (UMF No. 8).

At the time the program was being developed and implemented, the County required all design plans and specifications for the facility to be reviewed by the County's building official or his designee prior to construction. (UMF No. 9).  An EXCC tracking number was given to each program facility for tracking documents and associated comments, although no formal permit was required to be issued by the Building Official.

### A.  Design and Construction of the Gate Counters

The County retained Corgan Associates, Inc. as the architects and designers of the Terminal B program. (UMF No. 10).  Architect Brent Kelley (hereinafter "Kelley") served as Project Manager and Design Director for the design and construction of the terminal project at Sacramento International Airport from 2005 to its completion in 2011. (UMF No. 11).  In this role, Kelley was the Principal-in-Charge and Design Manager responsible for the design and technical document production of the Terminal B project, including both the terminal and airside concourse buildings. (UMF No. 12). The counters located at each of the gates on the air side of the terminal (i.e. "gate counters") were custom designed for placement and use in Terminal B. The task of designing the plans for the gate counters was subcontracted out to Fentress Architects. Included in Kelley's role as Project Manager and Design Director, he was responsible for reviewing and approving the plans prepared by Fentress Architects before they were used as the basis for construction of the gate counters in Terminal B.

 Gate counters are used to transact a variety of services and activities, which include, but are not limited to, exchanging documents, paying for an upgrade, gate checking luggage or other personal items

and obtaining information from airline staff. (UMF No. 13). The gate counters were designed with three heights: (1) the height of the work space counter where the employees work, (2) the height of the counter for standing customers and (3) the lowered counter on the front for customers in wheelchairs. (UMF No. 14). The lowered counter on the front of the gate counter is the part of the counter which is the subject of this motion.

At the time of the design and construction of Terminal B, Kelley was aware that the 1991 ADA Accessibility Guidelines ("ADAAG") and 2007 California Building Code ("CBC") applied to the construction of Terminal B.  The 1991 ADAAG required that the lowered portion of the counters be a minimum of 36" in length and a maximum height of 36". (UMF No. 15). The 2007 CBC required that the lowered portion of the counters be a minimum of 36" in length and a maximum height of 34". (UMF No. 16). There was no depth requirement for the lowered counter in the 1991 ADAAG or the 2007 CBC. (UMF No. 17). Fentress Architects designed the gate counters according to these specifications. Specifically, the gate counters were designed to contain a lower counter that was 65" in length and was 30" in height. Additionally, the gate counters were designed and constructed to allow a wheelchair a forward or parallel approach and provide depth of 8" to allow a customer to write on the surface. (UMF No. 18).  Moreover, because the counters were to be placed in an open space in the Terminal, the customer and airline agent would be able meet each other on the side of the counter podium to transact their business. (UMF No. 19). Kelley determined that these counters complied with both the 1991 ADAAG and the 2007 CBC, as they were less than 34" in height and more than 36" in length.  (UMF No. 20). Corgan reviewed and confirmed the contractor's construction of the gate counters in accordance with the plans prepared by Fentress.   (UMF No. 21).

Upon completion of construction, the County Building Department inspected the property and issued Certificates of Occupancy for the terminal and the concourse buildings.  The Certificate of Occupancy for Terminal B was issued on October 28, 2011 and the Certificate of Occupancy for Concourse B was issued on October 5, 2011. The first departing flights left Concourse B on October 6, 2011. (UMF No. 22).

At the inception of this litigation, the County retained an expert witness, Kim Blackseth (hereinafter "Blackseth"), to visit the Terminal and inspect the gate counters.  Blackseth is aware that the

appropriate standards for the design and construction of Terminal B based on the commencement of construction occurring in spring 2008 was the 1991 ADAAG and 2007 CBC.  (UMF No. 23).  Blackseth is aware that the 1991 ADAAG required that the lowered portion of the counters be a minimum of 36" in length and a maximum height of 36". Blackseth is also aware that the 2007 CBC required that the lowered portion of the counters be a minimum of 36" in length and a maximum height of 34".  There was no depth requirement for the lowered counter in the 1991 ADAAG or the 2007 CBC. (UMF No. 24).

Blackseth inspected the gate counters in Terminal B on December 2, 2013. Blackseth measured the surface of the lowered counter to be 28" from the ground, 65" in length and 8" deep in the middle which then tapers down to 6" deep at the ends. Additionally, Blackseth found that each gate counter provides space on the side of the podium for handing materials back and forth. (UMF No. 25). Blackseth determined that these counters complied with both the 1991 ADAAG and the 2007 CBC, as they were less than 34" in height and more than 36" in length. Because there was no depth requirement in the 1991 ADAAG or the 2007 CBC, Blackseth determined the 8" depth of the counter is inconsequential. (UMF No. 26). Moreover, in addition to the measurements of the gate counters complying with 1991 ADAAG, Blackseth determined that the counters also offer equivalent facilitation under 1991 ADAAG in that they allow for forward or parallel approach to write on the surface of the lower counter and have use of the space on the side of the counter podium for handing materials back and forth. (UMF No. 27).

Ms. Goldkorn has utilized the gate counters on numerous occasions. (UMF No. 28).  When she approaches a gate counter, she obtains services she needs on the side of the gate counter podium. (UMF No. 29).  Each time she has obtained service from the side of the gate counter podium, she has been able to successfully transact her business. (UMF No. 30).  She has been able to successfully have her wheelchair tagged for gate check-in, been able to exchange her boarding pass, and exchange the information she needed regarding the status of her flight. (UMF No. 31).  There has never been an occasion when Ms. Goldkorn has gone to the side of the gate counter podium when she has been unable to accomplish her purpose, nor has she ever missed a flight, been unable to have her wheelchair tagged for gate check-in, or been unable to exchange her boarding pass as a result of transacting her business on

the side of the gate counter. (UMF No. 32).  Ms. Goldkorn acknowledges that customer service can, and successfully does, occur on the side of the gate counters. (UMF No. 33).

### B.  Emergency Evacuation Procedures for Terminal B

The County of Sacramento has multiple documents, policies and procedures that can be described as plans for use during an emergency.   First, as required by the Federal Aviation Administration, the County has a "Sacramento International Airport Emergency Plan ("AEP").  The AEP is designed to comply with Title 14, CFR Part 139, *Certification of Airports*, to minimize the possibility and extent of personal injury and property damage on the airport in an emergency. It establishes an Emergency Management Organization and assigns functions and tasks consistent with California's Standardized Emergency Management System (SEMS) and the National Incident Management Systems (NIMS) and provides the framework for coordination and full mobilization of Airport and external resources. The AEP outlines strategies to 1) prepare for, 2) respond to, and 3) recover from an emergency or disaster. The AEP is reviewed every 12 months to ensure that all parties know their responsibilities and that all information in the plan is current. The most recent AEP was approved by the FAA on May 15, 2014. (UMF No. 34).[2]   The County Department of Airports holds full-scale airport emergency plan exercises at least once every 36 months. (UMF No.  35).

Additionally, the County has a *Terminal/Automated People Mover Evacuation Plan, 3rd Revision, April 15, 2013* (hereinafter "Emergency Evacuation Plan" or "EEP"). (UMF No. 36). The EEP is intended to be more specific than the AEP with regards to evacuating the public from the airport. (UMF No. 37).   The EEP serves the purpose of ensuring that Terminal facilities are evacuated in a safe and efficient manner. The EEP describes in detail the location of all emergency exits, evacuation areas and locations of the stair chairs. (UMF No. 38). It has sample evacuation announcements, as well as a checklist for Airport Operations during an emergency evacuation. (UMF No. 39). The EEP contains a section which specifically focuses on "Special Population Groups."

"Special Population Groups

---

[2] The County has not provided a copy of the Sacramento International Airport Emergency Plan to the Court as an exhibit because we do not cite to any specific language in it.  The document is quite voluminous at 528 pages in length.  It has been produced to Plaintiffs through discovery.  Defendant can provide a copy to the court if the Court prefers.

1    1) Anytime an evacuation is ordered, consideration must be given to the fact that there may be certain elements of the population present that may have difficulty in complying with an
2    evacuation directive.

3    2) Anticipated Special Population Groups (that may need assistance)

4        (a) Mobility impaired
    (b) Sight impaired
5        (c) Hearing impaired
    (d) Non-English speaking
6        (e) Other.   (UMF No. 40).

7    The EEP identifies the numerous individuals that can provide assistance to members of special

8    population groups, stating:

9    3) Assistance will be provided by the following, if available:

10       (a) Friend or relative
    (b) Supervisor or co-worker
11       (c) Building staff
    (d) First responders
12       (1) Firefighter
    (2) Law Enforcement.

13
14   4) First Responders, at the direction of the Evacuation Group Supervisor, will provide assistance to those occupants that are located in areas of refuge or sheltered in place and are not able to exit
15   the building on their own. (UMF No. 41).

16   Additionally, the EEP specifically outlines the methods of evacuation assistance to be considered:

17   5) Methods of evacuation assistance to be considered:

18       (a) Utilization of evacuation chair in stairways
    (b) Provide stabilization for those who need help walking
19       (c) Using wheelchairs for non-ambulatory individuals
    (d) Physically carry non-ambulatory individuals
20       (e) Emergency operation of elevators by first responders.  (UMF No. 42).

21   The plan also provides alternative methods that may be used to assist impaired and/or non-

22   English speaking building occupants:

23   (6)
    (a) Shelter in Place - when it is safer to stay in the current location rather than exiting.
24       Sheltering in place is generally only used for a short period of time.

25       (b) Relocation to an Area of Refuge - A location in a building designed to hold occupants when evacuation may not be safe or possible (typical area of refuge: stairwells).  (UMF
26       No. 43).

27   In the event of an immediate emergency, the airport firefighting group, Aircraft Rescue and

28   Firefighting ("ARFF"), and law enforcement are responsible for the evacuation of the building. (UMF

No. 44).   ARFF personnel are trained to move all groups of people, no matter what difficulty they might encounter.   Fire fighters receive initial rescue training in the Fire Academy. This training includes evacuation techniques like assisting, lifting, carrying, dragging, and moving persons from a dangerous environment.   (UMF No. 45).  If transportation is needed off site from the airport, the airport is equipped with ADA compliant buses to facilitate evacuation/relocation of special needs groups. (UMF No. 46).

        In addition to the specific provisions provided in the written EEP, there is signage that identifies emergency exits and evacuation routes located throughout the Terminal. (UMF No.  47). An overhead paging system has been incorporated into the emergency notification system to alert occupants in the event of a fire or other emergency. (UMF No. 48). First responders will provide directions to the communications center which will in turn relay them to the building occupants through the overhead paging system. Occupants will be directed to evacuate, shelter in place or relocate to another area within the building. (UMF No. 49). Waiting areas are available inside the stairways where disabled occupants can wait for assistance from first responders. (UMF No. 50). The first, second and third levels of the terminal building have exits (pedestrian bridges) that lead to either another building or a public way (roadway). (UMF No. 51). If individuals are unable to reach these exits, stairways are available where one can wait for assistance from first responders. (UMF No. 52).  Level 2 of the concourse has emergency waiting areas located outside each jet bridge vestibule emergency exit. (UMF NO. 53). There are also stair chairs located in Terminal B for use by first responders to assist in evacuating anyone needing assistance. The locations of these chairs are indicated in the EEP and known to the airport staff and first responders. (UMF No. 54). Additionally, ARFF has a stair chair on the fire engine. (UMF No. 55).  Stair chairs are carried on most transporting ambulances throughout Sacramento County. This provides an unlimited number of stair chairs and qualified fire personnel to use them when requested to respond to an airport emergency.  (UMF No. 56).  ARFF and the Sacramento County Sheriff's Deputies assigned to the airport are trained in operation of the stair chairs used for evacuation. (UMF No. 57).  ARFF also uses wheelchairs, aisle chairs (for narrow aircraft aisles) and gurneys for transporting individuals.  (UMF No. 58).  Additionally, the County provides training for airport management staff regarding ADA access.  (UMF No.59).

Kim Blackseth reviewed the EEP, as well as recent case law regarding the ADA and evacuation planning. Blackseth determined that the EEP provides equivalent services to mobility impaired individuals as to non-disabled individuals. (UMF No. 60).

Ms. Goldkorn has never been evacuated from Terminal B, nor has she been in Terminal B when there was an emergency evacuation. (UMF No. 61).  Ms. Goldkorn has never been evacuated from Terminal B in a stair chair. (UMF No. 62).  She has never heard an emergency announcement while in Terminal B.  (UMF No.  63). Moreover, since the Terminal opened in October 2011, there have been no emergency evacuations of the new Terminal B which required implementations of the EEP. (UMF No. 64).

## IV.   LEGAL ARGUMENT

Terminal B is operated by the County of Sacramento, a local government entity. As such, the requirements of Title II of the ADA, as well as the California Building Code, apply to its construction. State and local government agencies may not refuse to allow a person with a disability to participate in a service, program or activity simply because the person has a disability. Public entities must ensure that newly constructed buildings and facilities are free of architectural and communication barriers that restrict access or use by individuals with disabilities.

### A.    SUMMARY JUDGMENT IS APPROPRIATE FOR DEFENDANT AS TO THE GATE COUNTERS

Plaintiffs allege the gate counters in Terminal B are inaccessible to individuals with mobility impairments who use wheelchairs or scooters because the counters lack a lowered portion of the main counter in accordance with state and federal accessibility laws. Plaintiffs assert they are unable to utilize the lower counter because they cannot access all the services and activities for which the gate counter is used. Moreover, Plaintiffs claim the counters violate the law because the lower counter does not extend the full depth of the main counter. Plaintiffs' allegations are without merit.

#### 1.    Summary Judgment for Defendant on the First Cause of Action is Appropriate Because the Gate Counters in Terminal B are Compliant with the 1991 ADAAG and Thus, Do Not Violate the ADA

Congress enacted the ADA "to remedy widespread discrimination against disabled individuals."

PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001). Title II of the ADA, as well as the ADA's implemented regulations, provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132 and 28 C.F.R. § 35.149.

To establish a violation of Title II of the ADA, "a plaintiff must show: [(i)] he is a 'qualified individual with a disability'; [(ii)] he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and [(iii)] such exclusion, denial of benefits, or discrimination was by reason of his disability." Weinreich v. Los Angeles County Metro. Trans. Auth., 114 F.3d 976, 978 (9th Cir. 1997); see also 42 U.S.C. § 12132.

Defendant assumes for purposes of this motion that Plaintiff Goldkorn is a qualified individual with a disability and that Plaintiff CFILC advocates on behalf of qualified individuals with disabilities. However, that is the extent of Plaintiffs' ability to establish a violation of Title II of the ADA. Plaintiffs have not been excluded from participation in, discriminated against or denied the benefits of Defendant's services, programs or activities, nor would any such exclusion, denial of benefits, or discrimination, which Defendant denies occurred, be related to Plaintiffs' disability.

First, the 1991 ADAAG did not require the lowered counter to have a depth that extended the depth of the main counter. The requirement for a counter to extend the same depth as the service counter was not in effect until the 2010 ADAAG became operative in March 2012. 28 C.F.R. § 35.151(c). Because the construction of the Terminal began in 2008, and was completed and open to the public in October 2011 (UMF No. 22), the 2010 ADAAG requirements do not apply and the requirement for the counter to extend the depth of the main counter was not in effect. Rather, the 1991 Standard is the controlling regulation. 28 C.F.R. § 35.151(c).

The 1991 ADAAG Section 10.4.1(3) requires ticketing areas shall permit persons with disabilities to obtain a ticket and check baggage and shall comply with 7.2. Section 7.2 states:

> (2) At ticketing counters, teller stations in a bank, registration counters in hotels and motels, box office ticket counters, and other counters that may not have a cash register but at which goods or services are sold or distributed, either:

(i) a portion of the main counter which is a minimum of 36 in (915 mm) in length shall be provided with a maximum height of 36 in (915 mm); or

(ii) an auxiliary counter with a maximum height of 36 in (915 mm) in close proximity to the main counter shall be provided; or

(iii) equivalent facilitation shall be provided (e.g., at a hotel registration counter, equivalent facilitation might consist of: (1) provision of a folding shelf attached to the main counter on which an individual with disabilities can write, and (2) use of the space on the side of the counter or at the concierge desk, for handing materials back and forth).

28 C.F.R. pt. 36, App. D §7.2.

"Equivalent facilitation" is defined in the 1991 ADAAG: "Departures from particular technical and scoping requirements of this guideline by the use of other designs and technologies are permitted where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility." 28 C.F.R. pt. 36, App. D § 2.2.

The gate counters in Terminal B contain a lowered counter that measures 28" in height and 65" in width. These measurements satisfy the requirements under section 7.2(2)(i) of the 1991 ADAAG. Moreover, even if the lowered counters did not comply with section 7.2(2)(i), which Defendant asserts that it does, the gate counters offer equivalent facilitation as set forth in section 2.2 and 7.2(2)(iii) by providing 8" of depth which allows either a forward or parallel approach to use as a writing surface in conjunction with space on the side of the counter podium for transacting business. Ms. Goldkorn testified that she has been able to transact all her business each time she has obtained service from the side of the gate counter podium. (UMF No. 30).

A diligent search of statutes, regulations, practice guides, and case authority has failed to offer a definition of "portion of the main counter" under the 1991 ADAAG. This term was better understood in the 2010 ADAAG where section 28 C.F.R. part 36 § 904.4 stated, "The accessible portion of the counter top shall extend the same depth as the sales or service counter top." However, because the 2010 ADAAG was not yet in effect when the Terminal was designed and constructed (28 C.F.R. § 5.151(c)), Defendant's gate counters comply with the regulation in effect at the time of construction.

The undisputed facts in this case establish that the 1991 ADAAG applied to construction of Terminal B and the measurement specifications of the gate counters comply with those required in

section 7.2(2)(i). However, if the counters were not in compliance with the specifications of 7.2(2)(i), they offer equivalent facilitation by offering the lowered counter for writing on and space on the side of the podium for handing items back and forth, per Section 7.2.(2)(iii). Defendant has not discriminated against Plaintiffs or otherwise denied the benefits of Defendant's services, programs or activities in Terminal B. Thus, summary judgment is appropriate for Defendant as to Plaintiffs' first cause of action.

**2.     Summary Judgment for Defendant on the Second Cause of Action is Appropriate Because Defendant Did Not Receive Federal Funding for Terminal B and the Gate Counters are Compliant with the 1991 ADAAG and Thus, Do Not Violate the Rehabilitation Act**

Plaintiffs' second cause of action alleges Defendant violated Section 504 of the Rehabilitation Act of 1973 (hereinafter "Section 504").   Section 504  requires that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by  reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

**A.     Defendant Did Not Receive Federal Funding for the Design, Construction, Operation or Maintenance of Terminal B, and Thus Plaintiffs Cannot Maintain a Cause of Action under Section 504**

To establish a Section 504 violation, a plaintiff must show that the program receives federal funding.  29 U.S.C. § 794(a). Here, although the complete program was funded by a combination of funding from numerous sources all federal funds were allocated to specific elements of the airport, none of which include the buildings in which Plaintiffs allege they were denied access.  (UMF Nos. 5-8). The FAA specifically designated and instructed that its fund were to be used for elements such as the airplane taxiways, runways, baggage handling systems, and environmental impact studies. (UMF No. 7). Since no federal funds were used for the design, construction, operation or maintenance of either building identified in this litigation as "Terminal B" in which Plaintiffs allege they were denied participation in, the benefits of, or subjected to discrimination, Section 504 does not apply. Summary judgment should be granted for Defendant on Plaintiffs second cause of action.

**B.     The Gate Counters in Terminal B are Compliant with the 1991 ADAAG and Thus, Do Not Violate Section 504**

The Ninth Circuit has held that "there is no significant difference in the analysis of rights and obligations created by" the ADA and Section 504. <u>Vinson v. Thomas</u>, 288 F.3d 1145, 1152 n.7 (9th Cir.

2002); see also <u>Pierce v. County of Orange</u>, 519 F.3d 985, 1010 n.27 (9th Cir. 2008) ("Title II of the ADA was expressly modeled after § 504 . . . and essentially extends coverage to state and local government entities that do not receive federal funds.").  Thus, as set forth above in Section IV.A.1, because the gate counters are in compliance with the 1991 ADAAG and did not violate the ADA, there also is no violation of Section 504.  Summary judgment for Defendant on the second cause of action is appropriate.

**3.      Defendant is entitled to Summary Judgment on the Third Cause of Action Because the Gate Counters do not Violate the Unruh Civil Rights Act.**

The Unruh Act provides that persons with disabilities have equal access to streets, highways, public places, public conveyances, places of public accommodation, and housing. Cal. Civ. Code §§ 51, 54(a). A violation of the ADA constitutes a violation of the Unruh Act. Id. § 51(f). As set forth above in Section IV.A.1, because the gate counters are in compliance with the 1991 ADAAG and did not violate the ADA, there is also no violation of the Unruh Civil Rights Act.

Not only do the gate counters comply with the federal ADA requirements in effect at the time of construction, they also comply with California's Building Code requirements for disability access. The 2007 CBC was the controlling Building Code when the Terminal was designed and constructed.[3] Section 1121B.4.1.3 (Airports) requires ticketing areas to comply with Section 1122B.5, and the customer side of the baggage check-in area shall be accessible. Section 1122B.5 states:

> 1122B.5 – "At ticketing counters, teller stations in a bank, registration counters in hotels and motels, box office ticket counters, and other counters that may not have a cash register but at which goods or services are sold or distributed, a portion of the main counter which is a minimum of 36 inches (915 mm) in length shall be provided with a maximum height of 34 inches (864 mm)."

Thus, the California requirements differ from the 1991 ADAAG requirement only by limiting the height of the "portion of the main counter" to 34" instead of the federal 36" requirement. Here, however, that difference is inconsequential because the height of the lowered portion of the gate counter is 28", well below either the state or federal requirement. Thus, the gate counters as designed and constructed comply with both federal and state law.

---

[3] The next version of the California Building Code went into effect in 2010.

Because the gate counters contain a lowered portion of the main counter that satisfies the requirements of both the 2007 CBC and the 1991 ADAAG, there is no violation of either the ADA or the Unruh Civil Rights Act. Defendant is entitled to summary judgment for the third cause of action regarding the gate counters in Terminal B.

### 4. Summary Judgment for Defendant on the Fourth Cause of Action is Appropriate Because the County Has Not Violated California Disabled persons Act

The California Disabled Persons Act ("CDPA") provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, [and] facilities." Cal. Civ. Code. § 54.1. A violation of the ADA also constitutes a violation of the CDPA. Cal. Civ. Code. § 54(c).

Here, Plaintiffs' bases for this cause of action are the same allegations supporting their claim under the ADA.  Accordingly, Defendant is entitled to judgment as a matter of law as to Plaintiffs' CDPA claim because, as set forth above, Plaintiffs have not established a violation of the ADA.

### 5. Defendant is Entitled to Summary Judgment on the Fifth Cause of Action because Defendant does not Receive any State Funding for Any Programs or Activities in Terminal B and The County Has Not Violated California Government Code § 11135

California Government Code § 11135 provides that no person in the State of California shall, on the basis of disability, "be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Cal. Gov't Code § 11135.  This section "is identical to the Rehabilitation Act except that the entity must receive state financial assistance rather than Federal financial assistance." D.K. v. Solano County Office of Educ., 667 F. Supp. 2d 1184, 1190-91 (E.D. Cal. 2009) (England, J.).

Terminal B does not have "any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Cal. Gov't Code § 11135.  Thus, Defendant is entitled to judgment as a matter of law as to Plaintiffs' Section 11135 claim because, as set forth above in Section IV.A.1 and IV.2, Plaintiffs have not established a violation of Section 504 and the County does not receive state funding.

For the reasons set forth above, Defendant respectfully requests that the Court grant summary judgement on each and every cause of action alleged in the Complaint as it relates to the gate counters, on the basis that Defendant has not violated state or federal disability access laws.

**B.    SUMMARY JUDGMENT IS APPROPRIATE FOR DEFENDANT AS TO THE EMERGENCY EVACUATION PROCEDURES**

**1.    Plaintiffs Lack Standing to Bring Claims Related to the Emergency Evacuation Procedures in Terminal B**

The County contends that Plaintiffs CFILC and Goldkorn lack standing to sue with respect to the emergency evacuation procedures in Terminal B. The defense of lack of subject matter jurisdiction may be raised at any time, and the court is under a continuing duty to examine its jurisdiction. Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983).  Standing is not dispensed "in gross." Rather, a plaintiff must demonstrate standings for each claim and each form of relief sought. Davis v. Federal Election Comm'n, 554 U.S. 724, 734 (2008).

Those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy. City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983). To satisfy the "case or controversy" requirement, a plaintiff must establish standing under Article III. Human Life of Wash., Inc. v. Brumsickle, 624 F.3d 990, 1000 (9th Cir. 2010).  "[I]n order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." Sprint Commc'n Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273-74, (2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)) (emphasis added). "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-104 (1998). Where a plaintiff seeks only declaratory and injunctive relief, she must additionally show "a very significant possibility of future harm." Montana Shooting Sports Ass'n v. Holder, 727 F.3d 975, 979 (9th Cir. 2013); Clapper v. Amnesty Int'l USA,  U.S.    ,  , 133 S.Ct. 1138,

1147, 2013 U.S. LEXIS 1858 (2013) (noting that standing may be based on threatened injury only if it is "certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.") "To have standing to assert a claim for prospective injunctive relief, a plaintiff must demonstrate 'that he is realistically threatened by a repetition of [the injury].'" Melendres v. Arpaio, 695 F.3d 990, 997 (9th Cir. 2012) (quoting Los Angeles v. Lyons, 461 U.S. 95, 109 (1983)).  Article III standing is lacking where the proposed harm depends on the occurrence of "contingent future events that may not occur as anticipated, or indeed, may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998).  Additionally, an organization may not be permitted to sue in a representative capacity for injuries to its members unless at least one member has standing in his or her own right. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (343 (1977).

Here, Plaintiffs are unable to satisfy the requirement of demonstrating an "injury in fact."  Ms. Goldkorn has never been evacuated from Terminal B, nor has she been in Terminal B when there was an emergency evacuation. (UMF No. 61). She has no basis to assert that she was denied meaningful access to the County's EEP if she has never been a part of an evacuation. Thus, she has not suffered an "injury in fact" with regards to the Evacuation Plan.  Moreover, given that there have been no emergency evacuations of Terminal B since it opened (UMF No. 64), CFILC is unable to identify a single person that has been evacuated from the new Terminal B and suffered an injury in fact. As a result, CFILC also lacks standing to sue in a representative capacity.

Because Plaintiffs are seeking injunctive relief regarding the Evacuation Plan, they must additionally show "a very significant possibility of future harm." Montana Shooting Sports Ass'n v. Holder, 727 F.3d 975, 979. The proposed harm cannot depend on the occurrence of "contingent future events that may not occur as anticipated, or indeed, may not occur at all." Texas v. United States, 523 U.S. 296, 300.  Plaintiffs cannot satisfy this burden.  There is no way for Plaintiffs to establish that there is ""a very significant possibility" that they will be denied meaningful access to the program of the EEP, as such a denial would be based on "contingent future events that may not occur as anticipated, or indeed, may not occur at all."  Id.

For the above reasons, Plaintiffs lack standing to challenged the emergency evacuation procedures and summary judgment is proper for all causes of action as they relate to the that issue.

2.      **Summary Judgment is Proper on Every Cause of Action as They Relate to the Emergency Evacuation Plans for Terminal B**

"In evaluating whether a particular program complies with the ADA, the program must be evaluated 'in its entirety.' 28 C.F.R. § 35.150(a). '[T]he ADA does not . . . require perfection.' (Citation). … It does, however, require that 'when viewed in its entirety,' a 'service, program, or activity' administered by a public entity be 'readily accessible  to and usable by individuals with disabilities' 28 C.F.R. § 35.150(a)."  Brooklyn Center for Independence of the Disabled v. City of New York, 980 F.Supp.2d 588, 641-642 (S.D.N.Y. 2013) (hereinafter "BCID"). "The ADA and the Rehabilitation Act 'do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not.' (citation) The statutes, in other words, do not require 'optimal accommodations. (Citation)." BCID, 980 F.Supp.2d 588, 641.

The County's EEP accounts for the needs of individuals with mobility disabilities in the event of an evacuation in the same manner in which it provides for the needs of non-disabled individuals and contains a specific section entitled "Special Population Groups." This section identifies the special population groups that may need assistance, and specifically includes "mobility impaired" as a special group. (UMF No. 40). The plan identifies the numerous individuals that can provide assistance to the any special population groups, including but not limited to, friends or relatives, building staff and first responders. (UMF No. 41). The plan also specifically set forth that first responders will provide assistance to those occupants that are located in areas of refuge or sheltered in place and are not able to exit the building on their own. (UMF No. 41). Additionally, the plan outlines the methods of evacuation assistance to be considered, including but not limited to utilization of evacuation chairs in stairways, and emergency operation of elevators by first responders.  (UMF No. 42).

In addition to the plan instructions for mobility impaired individuals, the County has numerous evacuation chairs located throughout the Terminal, on the ARFF fire truck and on most transporting ambulances throughout Sacramento County.   This provides an unlimited number of stair chairs and qualified fire personnel to use them when requested to respond to an airport emergency. (UMF Nos. 54-

56). All ARFF and airport sheriff's deputies are trained in how to use these chairs. (UMF No. 57). ARFF also uses wheelchairs, aisle chairs (for narrow aircraft aisles) and gurneys for transporting individuals. (UMF No. 58). ARFF personnel are trained to move all groups of people they encounter in an emergency. This training includes evacuation techniques like assisting, lifting, carrying, dragging, and moving persons from a dangerous environment. (UMF No. 45). If transportation is needed off site from the airport, the airport is equipped with ADA compliant buses to facilitate evacuation/relocation of special needs groups. (UMF No. 46).

The plan in case of an evacuation is to relocate all members of the public to safety. First responders are trained in this effort and have equipment available to help them in this task. The EEP for Terminal B sets forth provisions for the successful evacuation of mobility impaired individuals in case of an emergency. Defendant is to provide Plaintiffs access to a service, program, or activity administered by a public entity that is readily accessible to and usable by individuals with disabilities. BCID, 980 F.Supp.2d 588, 641-642. "The ADA and the Rehabilitation Act 'do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not.' The statutes, in other words, do not require 'optimal' accommodations.." Id. at 641.

The County's Evacuation Plan thus satisfies the requirements under the ADA, and summary judgment should be granted for Defendant on the First Cause of Action. Additionally, because the Evacuation Plan is compliant with the ADA, it also does not violate Section 504, California's Unruh Civil Rights Act, California's Disabled Persons Act or California Government Code § 11135 et seq.. Summary judgment is therefore proper for Defendant on the Second through Fifth Causes of Action with respect to the Emergency Evacuation Plan.

C. **Defendant is Entitled to Summary Judgment on the Sixth Cause of Action because Defendant has Not Violated Federal or State Law With Respect to Its Gate Counters or Emergency Evacuation Plans**

The decision of whether to grant or deny permanent injunctive relief under Title II of the ADA is a matter of the district court's discretion. Midgett v. Tri-Cnty. Metro. Transp. Dist. of Or., 254 F.3d 846, 851 (9th Cir. 2001). The undisputed facts demonstrate that the County has complied with both federal

and state law with respect to the gate counters and the EEP.  As a result, Defendant should be granted summary judgment on the Sixth Cause of Action for injunctive relief.

**V.    CONCLUSION**

It has been clearly established that the 1991 ADAAG and the 2007 California Building Code apply to the design and construction of Terminal B. The gate counters provide a lowered portion of the counter in compliance with the 1991 ADAAG and the 2007 CBC in that they comply with the technical requirements under the law, as well as providing alternate equivalent facilitation.

Plaintiffs lack standing to assert claims related to the emergency evacuation procedures in Terminal B, and thus, summary judgement should be granted for Defendant.  Additionally, the Emergency Evacuation Plan and procedures for Terminal B take into account the needs of individuals with mobility disabilities and have provisions for assisting individuals with mobility disabilities in an evacuation.  First responders are trained in emergency evacuation for all members of the public, including those with mobility impairments.  Additionally the County has special equipment to assist in evacuation of individuals who need assistance.  The EEP ensures that Plaintiffs are afforded equivalent service in the County's evacuation procedures.

For the reasons set forth above, summary judgment is proper for Defendant on each and every cause of action as it relates to the gate counters and the emergency evacuation plans and procedures.

Dated:   April 17, 2015                              LONGYEAR, O'DEA & LAVRA, LLP


                                        By:   */s/ Kelley S. Kern*
                                              JOHN A. LAVRA
                                              KELLEY S. KERN