1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CALIFORNIA FOUNDATION FOR                    No.  2:12-CV-03056-KJM-GGH
     INDEPENDENT LIVING CENTERS, on
12   behalf of itself and others similarly
     situated, and RUTHEE GOLDKORN, on
13   behalf of herself and others similarly       ORDER
     situated,
14
                     Plaintiffs,
15
             v.
16
     COUNTY OF SACRAMENTO,
17
                     Defendant.
18

19

20              This matter is before the court on the parties' cross motions for summary

21   judgment.  The plaintiffs are the California Foundation for Independent Living Centers (CFILC)

22   and Ruthee Goldkorn.  The defendant is the County of Sacramento.  In addition to their motion

23   for summary judgment, the plaintiffs also move to strike a declaration submitted in support of the

24   County's opposition.  The court held a hearing on June 5, 2015.  Christine Chuang and Mary-Lee

25   Smith appeared for the CFILC and Ms. Goldkorn, and Kelly Kern appeared for the County.  For

26   the reasons described below, the parties' motions are each granted in part and denied in part.

27   /////

28   /////

                                                  1

1    I.      PROCEDURAL BACKGROUND

2           The plaintiffs filed their complaint in this court on December 20, 2012.  ECF

3    No. 1.  They allege violations of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C.

4    § 12132, *et seq.*; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the California

5    Unruh Civil Rights Act, Cal. Civ. Code § 51, *et seq.*; the California Disabled Persons Act

6    (CDPA), Cal. Civ. Code §§ 54–54.3; and California Government Code section 11135, *et seq.*

7    They seek declaratory relief, an injunction against future violations, damages, and attorneys' fees

8    and costs.  Other than a motion to consolidate, ECF No. 6, later denied as moot, ECF No. 21, no

9    motion practice occurred until the parties filed the pending motions for summary judgment on

10   April 17, 2015.  Pls.' Mot., ECF No. 37; Def.'s Mot., ECF No. 43.

11          The parties each seek partial summary judgment on two questions of liability, and

12   reserve other issues and any determination of remedies for later proceedings.  First, the parties

13   seek a determination under each of the statutes relied on in the complaint as to the accessibility of

14   certain gate counters at Terminal B of the Sacramento International Airport (the Airport).  *See*

15   Pls.' Mot. 1; Def.'s Mot. 1–2.  Second, the parties seek a similar determination as to the County's

16   emergency evacuation plans.  *See* Pls.' Mot. 1; Def.'s Mot. 1–2. The plaintiffs also seek to

17   preclude consideration of the supplemental declaration of Kim Blackseth, which the County

18   submitted in support of its opposition.[1]  Mot. Strike, ECF No. 54; *see also* Opp'n, ECF No. 57;

19   Reply, ECF No. 58.  After addressing the parties' evidentiary objections and then reviewing the

20   applicable legal standard, the court will turn to the substance of each claim.

21   II.     EVIDENTIARY OBJECTIONS

22          Rule 56 allows objections to evidence when "the material cited . . . cannot be

23   presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  As this

24   language suggests, at summary judgment, the evidence's propriety depends not on its form, but

25

26   _____

27        [1] The plaintiffs' motion rests on interpretation of Rules 702 and 703 of the Federal Rules
     of Evidence, and although titled a motion to strike, it is better understood as an evidentiary
     objection.  *See* Mot. Strike 1–2, ECF No. 54.  It is addressed below as such.

28

1   on its content. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Block v. City of L.A.*, 253 F.3d

2   410, 418–19 (9th Cir. 2001).

3      The party seeking admission of evidence "bears the burden of proof of

4   admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  Upon

5   objection, that party must direct the district court to "authenticating documents, deposition

6   testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary

7   principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle*

8   *Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  But courts are sometimes "much more

9   lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v.*

10   *U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

11     A. <u>Form Objections</u>

12      The County submitted several objections on the grounds that the plaintiffs'

13   proposed undisputed facts are vague, ambiguous, and without foundation.  Pls.' Reply Resp.

14   Stmt. Undisp. Mat. Facts (UMF1) nos. 12, 36, 39, 44, 45, 53, ECF No. 50-1.  Objections like

15   these are generally improper at the summary judgment stage because they are duplicative of the

16   summary judgment standard itself. *Burch v. Regents of University of California*, 433 F. Supp. 2d

17   1110, 1119 (E.D. Cal. 2006) ("A court can award summary judgment only when there is no

18   genuine dispute of *material* fact.  It cannot rely on irrelevant facts, and thus relevance objections

19   are redundant." (emphasis in original)).  These objections are overruled.

20     B. <u>Objections to the Testimony by Lay Witnesses</u>

21      The County objects to several of the plaintiffs' proposed undisputed facts as

22   speculative or improper legal opinions. *See* UMF1 nos. 12–13, 53.  A lay witness may testify to a

23   matter only if she has personal knowledge of it.  Fed. R. Evid. 602.  The witness's opinion must

24   be rationally connected to personal knowledge and helpful to the trier of fact.  Fed. R. Evid. 701.

25      A witness has personal knowledge only when testifying about events perceived

26   through physical senses or when testifying about opinions rationally based on personal

27   observation and experience. *United States v. Durham*, 464 F.3d 976, 982 (9th Cir. 2006); *United*

28   *States v. Simas*, 937 F.2d 459, 464 (9th Cir. 1991).  "Rationally connected," as used in Rule 701,

1    means the opinion is one that a normal person would form on the basis of the observed facts.

2    4 J. Weinstein & M. Berger, Weinstein's Evidence § 701.03[2] (2d ed. 2014).

3            Lay witness testimony is helpful if it assists a trier of fact to clearly understand the

4    witness's testimony or to determine a fact in issue.  Fed. R. Evid. 701(b).  Courts have found lay

5    witness testimony unhelpful and thus inadmissible if it is mere speculation, an opinion of law, or

6    if it usurps the jury's function.  Weinstein, *supra*, § 701.03[3]; *see also, e.g.*, *Nationwide Transp.*

7    *Fin. v. Cass Info. Sys., Inc*., 523 F.3d 1051, 1060–61 (9th Cir. 2008) (lay witnesses may not tell

8    the finder of fact what result to reach); *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir.

9    2007) (speculative testimony was inadmissible); *United States v. Crawford*, 239 F.3d 1086, 1090

10   (9th Cir. 2001) (legal conclusions are inadmissible when presented as lay testimony);.

11           The County objects that plaintiff Goldkorn lacks personal knowledge as to the line

12   of sight of other wheelchair users and of customer service agents at gate counters.  UMF1 nos.

13   12–13.  Ms. Goldkorn makes frequent use of the airport.  Goldkorn Dep. 45:19–46:19.  She

14   testified that when she approaches the gate counter, she has to say, "Hello, I'm here," wave her

15   hand, or go around the gate counter to receive service.  Goldkorn Dep. 60:18–20.  This

16   experience, compared to her observations of able-bodied persons at the gate counters, rationally

17   leads to the opinion that customer service agents could not always see her and other seated

18   passengers.  Her testimony is based on personal observation and is admissible.

19           The County also objects that Ms. Goldkorn may not testify about what emergency

20   warnings "must contain" because this testimony would be a legal opinion.  UMF1 no. 53.  In her

21   deposition, Ms. Goldkorn offered her observations that the Airport does not display signage or

22   maps showing accessible evacuation routes or giving directions about evacuation procedures to

23   people with mobility disabilities.  Goldkorn Dep. 97:21–98:12.  These facts do not rationally lead

24   to the conclusion that evacuation warnings must contain that information, and may not be cited

25   for that proposition.  This objection is sustained.

26       C.    Objections to Deposition Testimony by Mr. Mosher, a Representative Witness

27           The County objects that Mr. Mosher lacks sufficient personal knowledge to testify

28   as to the following matters concerning people with mobility disabilities: their knowledge of the

4

location of stair chairs, their unique needs during an evacuation, and the risk of exacerbating their disabilities by carrying them improperly.  UMF1 nos. 36, 39, 44.  These objections are misplaced.  The County designated Mr. Mosher to testify on its behalf under Federal Rule of Civil Procedure 30(b)(6).  His testimony represents the County's knowledge and subjective beliefs.  *Id.*  Unlike a lay witness, 30(b)(6) deponents may testify on matters outside of their personal knowledge so long as the testimony is based on the organization's knowledge.  *Bd. of Trustees of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.*, 253 F.R.D. 524, 525–26 (C.D. Cal. 2008).  Mr. Mosher's testimony that people with mobility disabilities do not know where to find stair chairs is rationally based on his belief that no signs indicate where to find evacuation chairs.[2]  Mosher Dep. 143:2–4.  Mr. Mosher's testimony that people with mobility disabilities have unique needs[3] and might be injured if not carried properly[4] represents the County's subjective understanding and is admissible.

The County also objects that Mr. Mosher was not designated to testify on the unique needs of people with mobility disabilities.  UMF1 nos. 39, 44.  "The case law is unsettled whether witness testimony at a 30(b)(6) deposition is limited to the subject matter in the designation of the notice."  *Detoy v. City and County of San Francisco*, 196 F.R.D. 362, 366 (N.D. Cal. 2000).  Most courts have held that a deponent may testify to matters beyond the designated topics.  *See, e.g., id.* at 365–67 (scope of 30(b)(6) deposition not limited to what is noticed in deposition subpoena because it would frustrate ability to obtain discovery of relevant information as permitted by Rule 26); *F.C.C. v. Mizuho Medy Co.*, 257 F.R.D. 679, 682 (S.D. Cal. 2009) (same); *E.E.O.C. v. Caesars Entm't, Inc.*, 237 F.R.D. 428, 432–33 (D. Nev. 2006)

---

[2] Mr. Mosher testified, "I don't think there are any signs as to where [the stair chairs] are located . . . .  I don't recall."  Mosher Dep. 143:2–4.

[3] Specifically, Mr. Mosher testified that he is sure there are specific needs that people with disabilities would have during an emergency, but he does not know what they are.  Mosher Dep. 104:6–12.

[4] Mr. Mosher testified that he understands an individual's mobility disability could be exacerbated if she is not carried properly.  Mosher Dep. 152:21–153:7.

1   (same); *but see Paparelli v. Prudential Ins. Co.*, 108 F.R.D. 727, 730 (D. Mass. 1985) (deposition

2   questions must be confined to matters stated with reasonable particularity in the notice of

3   deposition).  Under the majority of district courts' interpretations, which this court adopts, the

4   topics specified in the notice of deposition are a minimum indicator of the topics the witness must

5   be prepared to address, not a maximum.  *Detoy*, 196 F.R.D. at 366–67 (citing *King v. Pratt &*

6   *Whitney¸ a Div. of United Technologies Corp.*, 161 F.R.D. 475 (S.D. Fla. 1995)).  Defense

7   counsel may avoid prejudice by noting on the record that a represented witness's answer is not

8   representative, but his or her answer only.  *Caesars*, 237 F.R.D. at 433.

9          Here, defense counsel did not note during Mr. Mosher's deposition that his

10   answers were his only and not the County's.  His testimony on the needs of people with mobility

11   disabilities is admissible as representative testimony of the County's subjective understanding.

12          D.        Objections to Expert Witness Testimony

13          The opinions of three experts are subject to objections here: the County's expert,

14   Kim Blackseth, and the plaintiffs' experts, Peter Margen and June Kailes.

15                1.        Applicable Law

16          Federal Rule of Evidence 702 allows a person "qualified as an expert by

17   knowledge, skill, experience, training, or education" to offer opinions if

18          (a) the expert's scientific, technical, or other specialized knowledge
19          will help the trier of fact to understand the evidence or to determine
             a fact in issue;

20          (b) the testimony is based on sufficient facts or data;

21          (c) the testimony is the product of reliable principles and methods;
22          and

23          (d) the expert has reliably applied the principles and methods to the
             facts of the case.

24   Fed. R. Evid. 702.  The expert may rely on facts or data he has either personally observed or

25   otherwise "has been made aware of."  Fed. R. Evid. 703.  These facts or data need not even be

26   admissible at trial, so long as "experts in the particular field would reasonably rely on those kinds

27   of facts or data in forming an opinion on the subject."  *Id.*  Nevertheless, inadmissible underlying

28   /////

1   facts may be disclosed to the jury "only if their probative value in helping the jury evaluate the

2   opinion substantially outweighs their prejudicial effect." *Id.*

3          A district judge plays a "gatekeeping" role to ensure all expert testimony, scientific

4   or otherwise, is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49

5   (1999).  Expert testimony must be "properly grounded, well-reasoned, and not speculative."

6   *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (quoting Fed. R. Evid. 702

7   advisory comm. note (2000)).  Whether expert testimony is admitted is a matter of discretion. *See*

8   *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

9                         2.    Kim Blackseth

10         The most substantive of the parties' objections is the plaintiffs' motion to preclude

11  consideration of the supplemental declaration of Kim Blackseth, the County's accessibility

12  expert.  Mr. Blackseth submitted his original declaration in support of the County's motion for

13  summary judgment. *See* Blackseth Decl., ECF No. 43-4.  In this first declaration, he expressed

14  his opinion, among others, that the gate counters at Terminal B complied with the applicable

15  federal and state regulatory guidelines. *Id.* ¶ 10.  As a basis for this opinion he described his

16  experience and qualifications, including several California state building and access certifications,

17  previous appointments in California state government, membership in accessibility professional

18  associations, and twenty-six years' experience as an ADA and California Building Code (CBC)

19  consultant and expert witness. *Id.* ¶¶ 1–2.

20         Mr. Blackseth's supplemental declaration was submitted in support of the

21  County's brief in opposition to the plaintiffs' motion.  Blackseth Suppl. Decl., ECF No. 49-4.  In

22  this second declaration, Mr. Blackseth first reiterated his qualifications, then attached an email

23  exchange, dated April 24–29, 2015, between a member of his staff, Mike Miyaki, and Earlene

24  Sesker, an accessibility specialist of the Architectural and Transportation Barriers Compliance

25  Board (the Access Board).[5] *Id.* ¶¶ 5–8.  He attached a copy of their entire correspondence. *Id.*

26  Ex. A.

27

28         [5] The ADA requires the Attorney General promulgate regulations "consistent with the
    minimum guidelines and requirements issued by the Architectural and Transportation Barriers

1    Mr. Miyaki wrote first to Ms. Sesker, introducing himself as "a disabled access

2  consultant in California" and posing a question "about Sales and Service counters, and

3  specifically the depth requirements." *Id.* at 3.  He described a client who had proposed a "split

4  level counter top" with one side for customers and one side for employees.  *Id.*  Both surfaces

5  would be eighteen inches deep, but the "employee side" would be about six inches higher than the

6  "customer side." *Id.*  He sought Ms. Sesker's advice whether the federal guidelines required the

7  countertop's "accessible portion" to be the same depth as the entire countertop.  *Id.* at 3–4.

8    Ms. Sesker responded in apparent confusion, assuring Mr. Miyaki "the ADA

9  standards do not require work elements and spaces used solely by employees to be accessible

10  until an employee is hired that requires an accommodation," but she explained that the provisions

11  Mr. Miyaki had cited embodied "the intent . . . for the accessible portion of the counter to be the

12  same depth as the portion of the counter that is for public use." *Id.* at 2.  Mr. Miyaki clarified that

13  he had not inquired about "a fixed desk," but rather a "sales/transaction counter." *Id.*  He asked

14  whether, if "there is no depth requirement," "the depth of the public portion can be 6 inches, then

15  there can be a higher portion for employees." *Id.*  Ms. Sesker's response is at the core of the

16  plaintiff's pending motion as it concerns the Airport's gate counters.  She explained,

17
18
> The intent was that the person with the mobility impairment have
> the same counter space as a person without a mobility impairment.
> In the past at a sales and service counter a person without a mobility
> impairment may have a twelve inch counter to write a check and
> the person with the mobility impairment was given a 4 inch lowered
> shelf.  So the intent was to afford the same amount of space for
> everyone.

19
20

21  *Id.* at 1.

22  /////

23

---

24  Compliance Board." 42 U.S.C. § 12186(c).  "The Access Board is an independent federal agency
comprised of twenty-five persons—thirteen presidentially-appointed individuals and
25  representatives from twelve federal agencies, including the DOJ." *Miller v. California Speedway
Corp.*, 536 F.3d 1020, 1024 (9th Cir. 2008) (citing 29 U.S.C. § 792(a)(1)).  Congress also gave
26  the Access Board power to "develop advisory information for, and provide appropriate technical
assistance to, individuals or entities with rights or duties under regulations prescribed" under
27  Titles II and III of the ADA, among other things.  29 U.S.C. § 792(b)(2).

28

1    And so the chain ends.  From this exchange Mr. Blackseth inferred the Access

2  Board's understanding "that the 1991 ADAAG[6] did not have a depth requirement for the

3  lowered portion of the counter."  *Id.* ¶ 7.  Ms. Sesker's correspondence therefore "confirm[ed] his

4  expert opinion that the podium gate counters in Terminal B comply with the technical

5  requirements" of both the California and federal statutes.  *Id.* ¶ 8.

6    The parties do not dispute Mr. Blackseth's qualifications, and in their motion, the

7  plaintiffs do not challenge conclusions he reached in his first declaration.  Rather, plaintiffs

8  contend the opinion expressed in his supplemental declaration rests on insufficient facts or data

9  and was developed using unreliable principles and methods.  *See* Fed. R. Evid. 702(b), (c).

10    Mr. Blackseth's method was indeed unreliable.  His staff member, Mr. Miyaki,

11  asked Ms. Sesker about a hypothetical countertop arrangement different from the arrangement at

12  issue here.  At hearing, defense counsel explained that Mr. Miyaki's correspondence with

13  Ms. Sesker arose in the context of another assignment unrelated to this case.  Mr. Miyaki did not

14  confirm his understanding of Ms. Sesker's final email, which might have cleared up the confusion

15  evident in their previous emails.  Finally, the Department of Justice—not the Access Board—is

16  responsible for interpreting the applicable regulatory scheme and may adopt an interpretation of

17  the enforceable "standards" that differs from that of the non-enforceable "guidelines."  *See Miller*,

18  536 F.3d at 1031–32 & n.3 (explaining the difference).  The Access Board offers only "technical

19  assistance" and develops "advisory information."  29 U.S.C. § 792(b)(2).  Although an expert

20  may conceivably seek technical assistance from the Access Board as part of a reliable method,

21  Mr. Blackseth's particular method here was not reliable.  The objection is sustained.

22    Likewise the objection is sustained as to the underlying email exchange.  For the

23  reasons described above, experts in Mr. Blackseth's field would not reasonably rely on that

24  exchange, so it cannot be admissible under Rule 703 as the basis of his opinion.  Furthermore, the

25  email exchange consists of out-of-court statements offered to show the applicable regulations

26  include no depth requirement, that is, the truth of the matter asserted.  It is therefore hearsay.  *See*

27

28    [6] *See* section IV.b) below for a summary of the ADAAG and other applicable regulations.

1   Fed. R. Evid. 801(a)–(c).  Because the County has made no effort to show an exception or

2   exclusion applies, the exchange is inadmissible.  *See Oracle*, 627 F.3d at 385–86.  Although

3   hearsay may at times be considered on summary judgment, inadmissible hearsay cannot support

4   judgment in the proponent's favor.  *See, e.g.*, *Burch*, 433 F. Supp. 2d at 1121.  Neither may the

5   County rely on the email exchange in opposition to the plaintiffs' motion; it is doubtful Ms.

6   Sesker's statements in those emails could be reduced to admissible form at trial.  *Cf. Fraser v.*

7   *Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (hearsay evidence may be considered at summary

8   judgment when its contents could be presented in an admissible form at trial).

9                          3.      Peter Margen

10          Mr. Margen offers his opinion that because wheelchair user's line of sight is lower

11   than that of most able-bodied people, wheelchair users using the gate counters face a vertical wall

12   rather than the employee standing across the counter.  Margen Decl. ¶ 23, ECF No. 40.  The

13   County objects that Mr. Margen's testimony is speculation, *see* UMF1 no. 12, essentially

14   challenging his testimony as lacking sufficient foundation in facts or data, *see* Fed. R. Civ. P.

15   702(b).  Mr. Margen was offered as an expert on disability access.  Margen Decl. ¶¶ 3, 6.  He was

16   made aware of Ms. Goldkorn's experiences and personally observed other passengers'

17   interactions at the gate counter.  Pls.' Resp. Evid. Objections 4, ECF No. 50-3.  He also bases his

18   opinion on knowledge of studies showing the average sightlines of wheelchair users.  Margen

19   Reply Decl. ¶ 9, ECF No. 51.  His testimony is based on sufficient facts and is admissible.

20                          4.      June Kailes

21          The County objects to testimony by Ms. Kailes about what emergency warnings

22   "must contain," arguing this is an improper legal opinion.  UMF1 no. 53; *see* Kailes Decl. ¶ 38,

23   ECF No. 41.  Legal conclusions are not normally helpful to the trier of fact and should be

24   excluded.  *See* Fed. R. Evid. 702(a); *Nationwide Transp. Fin. V. Cass Info. Sys., Inc.*, 523 F.3d

25   1051, 1058 (9th Cir. 2008).  Ms. Kailes bases her opinion of what the Airport's evacuation plan

26   must contain on her review of the Airport's evacuation plan, her background and experience as a

27   specialist in emergency planning for people with disabilities, and her knowledge of national

28   guidance documents on emergency planning for people with disabilities.  Kailes. Decl. ¶ 15.  She

has sufficient expertise to give her evaluation of the Airport's evacuation plan.  She does not

conclude the Airport's evacuation plan violates legal standards.  Her testimony is admissible.

III.       UNDISPUTED FACTS

Unless otherwise noted, the court has determined the following facts are not

subject to genuine dispute.  Plaintiff Goldkorn is an individual with a mobility disability who uses

a wheelchair.  UMF1 no. 71.  Plaintiff CFILC is a statewide nonprofit association made up of

independent living centers that employ and serve people with disabilities.  UMF1 no. 72.  Ms.

Goldkorn and many members of the CFILC use mobility aids, such as wheelchairs, scooters, and

walkers.  UMF1 no. 73.  Ms. Goldkorn and members of CFILC routinely make use of the Airport.

UMF1 nos. 74–75.

The County built and operates the Airport.  UMF1 no. 76.  It began construction of

Terminal B, the subject of this case, in 2008.   UMF1 no. 2.  Terminal B includes the terminal,

where ticketing counters are located; the concourse, where the departure gates are located; and the

automated people mover, which connects the terminal to the concourse.  UMF1 no. 3.  The

County required all design plans and specifications for the airport program to be reviewed by the

County's building official before construction.  Defs.' Resp.  Stmt. Undisp. Mat. Facts (UMF2)

no. 9, ECF No. 52-1.  Construction was completed on October 6, 2011.  UMF1 no. 1.  Upon

completion, the County Building Department inspected the property and issued Certificates of

Occupancy for the terminal and concourse buildings.  UMF2 no. 22.

The parties agree the County is a public entity and that Terminal B is a place of

public accommodation within the meaning of Title II of the ADA, 42 U.S.C. §§ 12101–12213.

UMF1 nos. 77, 79.  In addition, the County received funding for its airport program from the

federal Department of Transportation and through California state grants.  UMF1 nos. 80–81;

UMF2 no. 6.  Each source allocated funding to specific portions of the airport program.  UMF2

no. 5.  The County did not allocate any federal or state funds to the design, construction,

operation, or maintenance of Terminal B; these funds were used for other purposes, such as

taxiways, runways, and baggage handling systems.  UMF2 nos. 7, 8.

/////

The parties' motions are for partial summary judgment and concern two issues: accessibility of the terminal's gate counters and allegedly discriminatory provisions of the Airport's emergency evacuation plan.

1.      Gate Counters

Terminal B houses nineteen gates, and in front of each stands a gate counter. UMF1 no. 4.  Each gate counter includes two "service terminals" where passengers and Airport staff conduct a variety of transactions and services related to flights, ticketing, and checking luggage.  UMF1 no. 5.  Each gate counter has two surfaces: an upper surface and a lower surface that juts out horizontally from the counter's vertical front.  UMF1 nos. 8–9.  The gate counter stands 48 inches from the floor to the top surface, 78.5 inches in width (left to right), and 14 inches in depth (front to back).[7]  UMF1 no. 8.  The lower surface is approximately 30 inches high.  UMF1 no. 9.  The County has submitted evidence to show the gate counters were designed to allow a wheelchair user to approach each counter from the front or side and to provide a depth that would allow a customer to write on the lower surface.  UMF2 no. 18.  The lowered surface is deep enough to hold belongings such as purses, wallets, briefcases, and cell phones.  UMF1 no. 11.  It does not fold down to be flush with the gate counter's vertical face.  UMF1 no. 10.

Ten of the nineteen gate counters have a boarding gate reader and a podium attached to the side.  UMF1 no. 15.  The other nine have a boarding gate reader away from the counter and closer to the gate.  Mosher Dep. 39:21–22.  Some gate counters are tandem counters, that is, two gate counters are attached to one another, Mosher Dep. 63:7–19, so the two middle service terminals of these gate counters have no side access, UMF1 no. 16.

A wheelchair user's line of sight at a gate counter may not be comparable to that of able-bodied persons.  UMF1 no. 12.  Plaintiff Goldkorn testified she had experienced difficulties being seen and receiving service.  Goldkorn Dep. 60:18–20.  For Airport customer

---

[7] The actual measurements taken by Plaintiffs' witnesses are consistent with County's architectural plans; any deviations in dimensions are minor.  UMF1 nos. 8–9; UMF2 no. 18.  The parties dispute whether the width of the lower portion is 65 inches (Kelley Decl. ¶ 8, ECF 43-7) or 78.5 inches (UMF1 no. 9).  They also dispute whether the lower surface is 8 inches deep (Kelley Decl. ¶ 9, ECF 43-7) or 6.75 inches deep (UMF1 no. 9).

1    service agents to simultaneously hear her, stand in front of the computer screen, and talk to her,

2    she had to "go into their workspace."  Goldkorn Dep. 78:3–8.  Despite these difficulties,

3    Ms. Goldkorn has always been able to obtain services on the side of a gate counter and

4    successfully transacted her business at each visit.  UMF2 nos. 29–33.

5         A customer service agent may reach over the top of the counter or come around to

6    the side to assist people in wheelchairs.  Mosher Dep. 54:2–54:22.  The parties disagree whether

7    these measures enable airline staff to interact with wheelchair users as they otherwise would with

8    able-bodied customers.  UMF1 no. 14.

9                        2.      Evacuation Plan

10        The parties agree an evacuation plan is essential for the safety of all people in an

11   airport and agree an evacuation plan must anticipate the needs of the general public during an

12   emergency.  UMF1 nos. 17–19.  The parties also agree that people with mobility disabilities face

13   specific additional needs during an airport evacuation, UMF1 no. 21, that detailed procedures

14   should be prepared in advance of an emergency, and that knowledge of those procedures is

15   necessary to meet the specific needs of people with mobility disabilities, especially in light of the

16   stress, rush, and chaos of an emergency, UMF1 no. 49.

17        The Airport's "Terminal/Automated People Mover Evacuation Plan" provides

18   instructions for evacuations in an emergency.  It describes procedures for actual evacuation,

19   communications about evacuations, and recovery after evacuations.  UMF1 no. 28.  No

20   emergency has required the County to implement its plan since Terminal B opened.  UMF2

21   no. 64.  Ms. Goldkorn has also never been evacuated or heard an emergency announcement while

22   inside Terminal B.  UMF2 nos. 62–63.

23        The evacuation plan includes a two-page section addressing the evacuation of

24   individuals in "Special Population Groups."  UMF1 no. 22.  Special Population Groups are

25   defined to include, among others, the mobility impaired.  Mosher Decl. Ex. A, at 8, ECF 43-5.

26   The section identifies others who can provide assistance to members of special population groups

27   and the methods of assistance they may consider.  UMF2 nos. 41–42; Mosher Decl. Ex. A,

28   at 8–9.

13

The evacuation plan describes in detail the location of all emergency exits, evacuation areas, and stair chairs.[8]  UMF2 no. 38.  The Airport has several potential evacuation routes.  The first, second, and third levels of Terminal B have pedestrian bridges that lead to another building or a public way.  UMF2 no. 51.  The terminal's fourth floor has two emergency exits, the third floor has six, UMF1 no. 29, and the concourse has an emergency exit at each of the nineteen gates.  UMF1 No. 30.  If passengers must be evacuated from the people mover, which provides transportation between the terminal and concourse, they must walk along a path between the two tracks.  UMF1 No. 31.  Wheelchair passengers are not allowed on this path without assistance.  UMF1 no. 46.  The County has not provided its staff with training on the evacuation of people with mobility disabilities from the people mover.  *See* Mosher Dep. 163–165.

Although all of the exits are accessible to able-bodied persons, people with mobility impairments may require assistance evacuating stairwells when elevators or escalators are not in service.  UMF1 no. 32.  For example, to evacuate using a stairwell, people with mobility disabilities may require transport by a stair chair or some other device.  UMF1 no. 33.  Disabled occupants can wait for assistance from first responders in waiting areas inside each stairway.  UMF2 no. 50.  Level 2 of the concourse also has emergency waiting areas located outside each jet bridge vestibule emergency exit.  UMF2 no. 53.

The Airport has six stair chairs: one on the third floor, one on the fourth floor, and four on the concourse.  UMF1 no. 34.  The Airport Rescue and Firefighters (ARFF) have one more on their fire truck, *see id.*, and stair chairs are also carried on most transporting ambulances throughout Sacramento County, UMF2 no. 56.  The County has never conducted a survey of how many people in the Airport at a given time may require evacuation chairs.  UMF1 no. 37.  However, at least 50 to 100 wheelchairs may be found in Terminal B.  UMF1 no. 38.

/////

---

[8] A "stair chair" is a device used to transport a person who is non-ambulatory up or down stairs.  The court is aware of no evidence on the record that shows how a stair chair is operated or by how many people.

Airport staff and first responders know where to find stair chairs.  UMF2 No. 54. When asked whether signs inside Terminal B indicated the locations of stair chairs, the County's representative witness and ADA coordinator, Carl Mosher, testified he could not recall.  Mosher Dep. 142:24–143:12.  He further testified that people with mobility disabilities do not know where to find evacuation chairs.  *Id.* at 143:13–20.  Ms. Goldkorn testified she saw no signs describing accessible evacuation routes.  Goldkorn Dep. 97:19–98:12.  About twenty airport managers have training related to the stair chairs.  UMF1 no. 43.  Mr. Mosher did not know whether the Airport's operations staff has received training about how to use the stair chairs in an emergency evacuation.  Mosher Dep. 130:1-16.

People with mobility disabilities need help from persons trained to provide evacuation assistance and advance planning for that assistance.  UMF1 no. 40.  Mr. Mosher agrees that if persons with mobility disabilities are not carried properly, a person's disability or disabilities could conceivably be exacerbated.  UMF1 no. 44.  According to the evacuation plan, evacuation assistance for people with mobility disabilities will be provided "if available" by friends or relatives, supervisors or co-workers, building staff, or first responders.  UMF 1 no. 41. If first responders are not available, people with mobility disabilities might rely on fellow passengers to assist in an evacuation.  UMF1 no. 50.  The County has of course not trained friends, relatives, or other passengers, to assist in an evacuation.  UMF1 no. 42.

In the event of an evacuation, first responders determine the needs of all persons upon arrival, including details of how to evacuate people with mobility disabilities.  UMF1 nos. 25–26.  The County relies on these first responders to meet the needs of persons with mobility disabilities.  UMF1 no. 66.  The ARFF does not have specific written plans for addressing the needs of persons with mobility disabilities, UMF1 no. 69, and Mr. Mosher was not aware whether the Sheriff's Department has conducted any training or has plans to address the needs of people with disabilities, UMF1 no. 70.  Firefighters do receive training in general evacuation techniques, including assisting, lifting, carrying, dragging, and moving persons from a dangerous environment.  UMF2 no. 45.  No first responders are assigned exclusively to the evacuation of people with mobility disabilities.  UMF1 no. 45.

15

1        The Airport notifies the public of an evacuation primarily by announcements over

2   a public address system.  UMF1 no. 51.  The evacuation plan includes several pre-scripted

3   emergency announcements.  UMF1 no. 52.  The pre-scripted announcements include no specific

4   information for people with mobility disabilities.  UMF1 no. 54.  The County also communicates

5   information by signs displayed inside the terminal; the parties agree accessible evacuation routes

6   should be well-marked by signs throughout the Airport, UMF 1 no. 58, but signage throughout

7   Terminal B indicates evacuation routes for only the general public, UMF 1 no. 57; Goldkorn Dep.

8   97–98.

9        In the recovery period after an emergency situation, people with mobility

10  disabilities may need to be reunited with their durable medical equipment, such as wheelchairs or

11  walkers.  UMF1 no. 61.  If it is necessary to transport people to a safe area after evacuation,

12  people with mobility disabilities also require accessible vehicles and information about accessible

13  pick-up points.  UMF1 no. 62.  Although it is undisputed that the County has accessible, ADA-

14  compliant buses on site, the County has not provided evidence that these buses will be available

15  to assist persons with disabilities, or what plans exist for their use in an emergency.  UMF1

16  no. 62.  The Airport's evacuation plan describes procedures to be taken only for returning the

17  general public to the building.  UMF1 nos. 63–64.  It also has no specific, written plans for

18  returning people with mobility disabilities to the Airport or for reuniting them with their mobility

19  aids.  UMF1 nos. 63–64.

20  IV.    LEGAL STANDARD

21       A court must grant a motion for summary judgment "if the movant shows there is

22  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

23  law."  Fed. R. Civ. P. 56(a).  A motion for summary judgment calls for a "threshold inquiry" into

24  whether a trial is necessary at all, that is, whether "any genuine factual issues . . . properly can be

25  resolved only by a finder of fact because they may reasonably be resolved in favor of either

26  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[9]  The court does not weigh

27

28       [9] Rule 56 was amended, effective December 1, 2010; however, it is appropriate to rely on
cases decided before the amendment took effect, as "[t]he standard for granting summary

16

1    evidence or evaluate the credibility of witnesses; rather, it determines which facts the parties do

2    not dispute, then draws all inferences and views all evidence in the light most favorable to the

3    nonmoving party. *See id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

4    574, 587–88 (1986). "Where the record taken as a whole could not lead a rational trier of fact to

5    find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587

6    (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

7            The moving party bears the initial burden of "informing the district court of the

8    basis for its motion, and identifying those portions of the [record] which it believes demonstrate

9    the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If the party opposing

10   summary judgment bears the burden of proof at trial, the moving party need only illustrate the

11   "absence of evidence to support the non-moving party's case." *In re Oracle*, 627 F.3d at 387.

12   The burden then shifts to the non-moving party to "go beyond the pleadings" and "designate

13   specific facts" in the record to show a trial is necessary to resolve genuine disputes of material

14   fact. *Celotex*, 477 U.S. at 324 (quotation marks omitted). The non-moving party "must do more

15   than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*,

16   475 U.S. at 586. "Only disputes over facts that might affect the outcome of the suit under the

17   governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at

18   247–48.

19           Here, the parties' motions are for only partial summary judgment, but the same

20   standard applies. *See* Fed. R. Civ. P. 56(a) (allowing a party to "identify[] each claim or

21   defense—or the part of each claim or defense—on which summary judgment is sought"). Cross

22   motions are also evaluated separately under the same standard. *Am. Civil Liberties Union of*

23   *Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

24   /////

25   /////

26

27   judgment remains unchanged." Fed. R. Civ. P. 56, notes of advisory comm. on 2010
     amendments.

28

1  V.      DISCUSSION

2          The court now reaches the motions for summary judgment.  As described above,

3  these motions address both the Airport's gate counters and the County's emergency evacuation

4  plans.  In each instance the plaintiffs have alleged claims under Title II of the ADA, section 504

5  of the Rehabilitation Act, the California Disabled Persons Act and Unruh Act, and section 11135

6  of the California Government Code.  The court considers each claim in turn, merging analysis of

7  the cross-motions in a single discussion.

8          A.      Gate Counters

9                  1.      Title II of the ADA

10                         a)      In General

11         The ADA is meant to remedy "widespread discrimination against disabled

12  individuals," *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001), including "outright intentional

13  exclusion, . . . failure to make modifications to existing facilities and practices, . . . and relegation

14  to lesser services, programs, activities, benefits, jobs, or other opportunities," 42 U.S.C.

15  § 12101(a)(5).  Congress intended not only to prohibit intentional discrimination but also to

16  prevent discrimination by "thoughtlessness and indifference" and "benign neglect."  *Alexander v.*

17  *Choate*, 469 U.S. 287, 295 (1985); *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996).

18  Title II of the ADA applies to state and local governments.  *Daubert v. Lindsay Unified Sch.*

19  *Dist.*, 760 F.3d 982, 985 (9th Cir. 2014).  Its hub broadly forbids discrimination on the basis of

20  disability: "no qualified individual with a disability shall, by reason of such disability, be

21  excluded from participation in or be denied the benefits of the services, programs, or activities of

22  a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

23         The Ninth Circuit has described three elements of a plaintiff's case under Title II.

24  "[T]he plaintiff must show that: (1) he is a qualified individual with a disability; (2) he was either

25  excluded from participation in or denied the benefits of a public entity's services, programs, or

26  activities, or was otherwise discriminated against by the public entity; and (3) this exclusion,

27  /////

28  /////

18

1    denial, or discrimination was by reason of his disability."[10]  *Cohen v. City of Culver City*,

2    754 F.3d 690, 695 (9th Cir. 2014).  The parties agree for purposes of this motion that the

3    plaintiffs are either qualified persons with disabilities or advocate on behalf of qualified persons

4    with disabilities.  *See* Pls.' Mot. at 10; Def.'s Mot. at 10.  The second and third elements remain

5    in dispute.

6                                  b)        Applicable Regulation

7            Architectural barriers fall within the scope of Title II.  *See, e.g.*, 42 U.S.C.

8    § 12101(a)(5); *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1172–74 (9th Cir.

9    2010).  Here, in the case of a newly-constructed facility, "compliance with the ADA's

10   antidiscrimination mandate requires that facilities be 'readily accessible to and usable by

11   individuals with disabilities.'"  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th

12   Cir. 2011) (en banc) (quoting 42 U.S.C. § 12183(a)(1)).  "Whether a facility is 'readily

13   accessible' is defined, in part, by the ADA Accessibility Guidelines," usually abbreviated

14   "ADAAG."[11]  *Id.* (citing 28 C.F.R. § 36.406(a) and 28 C.F.R. pt. 36, app. A).  "The ADAAG is a

15   comprehensive set of structural guidelines that articulates detailed design requirements to

16   _____

17       [10] In other cases the Ninth Circuit has expanded the first element to two.  *See, e.g.*,
     *Sheehan v. City & Cnty. of S.F.*, 43 F.3d 1211, 1232 (9th Cir. 2014) ("[A] plaintiff generally must
18   show: (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or
     receive the benefit of a public entity's services, programs, or activities; (3) she was either
19   excluded from participation in or denied the benefits of the public entity's services, programs or
     activities or was otherwise discriminated against by the public entity; and (4) such exclusion,
20   denial of benefits or discrimination was by reason of her disability."), *cert. dismissed in relevant
     part sub nom. City & Cnty. of S.F., Calif. v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765 (2015)).
21   This difference is not material, and application of one standard or the other would not change the
     result here.
22

23       [11] The ADAAG are only one part of the applicable regulation.  Constructions or
     alterations commenced between July 26, 1992 and September 15, 2010 must comply with either
24   the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. pt. 101–19.6, App. A, or the
     ADAAG, 28 C.F.R. Pt. 36, App. A.  28 C.F.R. § 35.151(c)(1).  Courts generally interpret section
25   35.151(c) to allow a public entity to choose between the UFAS and ADAAG.  *See, e.g.*, *Kirola v.
     City & Cnty. of S.F.*, 74 F. Supp. 3d 1187, 1212 (N.D. Cal. 2014).  The two standards "are more
26   alike than different, but they are not identical."  *Cherry v. City Coll. of S.F.*, No. 04-04981,
     2006 WL 6602454, at *3 (N.D. Cal. Jan. 12, 2006).  Here, the parties agree the ADAAG applies.
27   UMF1 no. 6.

28

                                                19

accommodate persons with disabilities." *Daubert*, 760 F.3d at 986. "The ADAAG's requirements are as precise as they are thorough, and the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman*, 631 F.3d at 945–46.

Because construction of Terminal B commenced in 2008, the 1991 version of the ADAAG applies here. *See* 28 C.F.R. § 35.151(c)(1); UMF1 no. 6. Section 10.4.1(3) applies to newly constructed airports: "Ticketing areas shall permit persons with disabilities to obtain a ticket and check baggage and shall comply with [section] 7.2." 28 C.F.R. pt. 36, App. D § 10.4.1(3). Section 7.2(2)[12] provides as follows:

> At ticketing counters, teller stations in a bank, registration counters in hotels and motels, box office ticket counters, and other counters that may not have a cash register but at which goods or services are sold or distributed, either:
>
> (i) a portion of the main counter which is a minimum of 36 in (915 mm) in length shall be provided with a maximum height of 36 in (915 mm); or
>
> (ii) an auxiliary counter with a maximum height of 36 in (915 mm) in close proximity to the main counter shall be provided; or
>
> (iii) equivalent facilitation shall be provided (e.g., at a hotel registration counter, equivalent facilitation might consist of: (1) provision of a folding shelf attached to the main counter on which an individual with disabilities can write, and (2) use of the space on the side of the counter or at the concierge desk, for handing materials back and forth).

*Id.* § 7.2(2). An "equivalent facilitation" is one that allows for "[d]epartures from particular requirements" of this standard "by the use of other methods . . . when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided." 28 C.F.R. § 35.151(c)(1). It is a "departure from particular technical . . . requirements . . . by the use of other designs and technologies . . . where the alternative designs and technologies used will

---

[12] Section 7.2 includes three subsections. Section 7.2(1) governs "department stores and miscellaneous retail stores where counters have cash registers and are provided for sales or distribution of goods or services to the public." Section 7.2(3) is an empty placeholder for "Assisted Listening Devices."

1  provide substantially equivalent or greater access to and usability of the facility."  28 C.F.R.

2  pt.  36, App. D, § 2.2.

3                              c)      Discussion

4          The parties agree the provisions cited above are determinative of the County's

5  liability, but disagree on their interpretation.  *See* Pls.' Mot. 11–12; Def.'s Mot. 10–12.  In this

6  situation, "the principles of statutory interpretation apply equally to regulatory interpretation

7  . . . ."  *Bergmann v. C.I.R.*, 552 F. App'x 673, 674 (9th Cir. 2014) (unpublished) (citing *Boeing*

8  *Co. v. United States*, 258 F.3d 958, 967 (9th Cir. 2001), *aff'd*, 537 U.S. 437 (2003)); *see also*

9  *Aguayo v. U.S. Bank*, 653 F.3d 912, 925 (9th Cir. 2011) ("Because [the regulations in question]

10  carry the same weight as federal statutes, this interpretation rule is equally applicable here.").  In

11  general, "[t]he plain meaning of a regulation governs" its interpretation.  *Wards Cove Packing*

12  *Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002).  "Plain meaning,

13  however, is not the end of the inquiry.  The plain language of a regulation does not control if

14  clearly expressed administrative intent is to the contrary or if such plain meaning would lead to

15  absurd results."  *Pac. Bell Tel. Co. v. California Pub. Utilities Comm'n*, 621 F.3d 836, 848 (9th

16  Cir. 2010) (citations and internal quotation marks omitted).  The court may also consider whether

17  an interpretation "is in accord with the structure of the regulation" or "the regulatory purpose"

18  and may look to "the practical consequences of the suggested interpretations," not to mention

19  common sense.  *Crown Pac. v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036,

20  1038–40 (9th Cir. 1999).

21          Here, as described above, the nineteen Terminal B gate counters are about 48

22  inches from floor to top, about 80 inches from left to right, and about 14 inches deep.[13]  Another

23  lowered surface is attached to the gate counter's vertical front panel.  This second surface is about

24  28 inches from the floor, 65 inches from left to right, and between 6 and 8 inches deep.  A

25  passenger in a wheelchair or scooter may approach the counter from its front side or on a path

26

27          [13] Minor deviations between the planned and actual measurements do not affect the
    court's decision.

28

                                        21

1    parallel to its width.  As clarified at the hearing, the parties agree the lowered surface is not an

2    auxiliary counter.  This leaves two possibilities.  The gate counters comply with section 7.2(2) if

3    (a) the lowered surface is "a portion of the main counter" within the meaning of section 7.2(2)(i);

4    or (b) the lowered surface is "an equivalent facilitation" or permissible "[d]eparture" within the

5    meaning of section 2.2, section 7.2(2)(iii), and 28 C.F.R. § 35.151(c)(1).

6              In isolation, the plain meaning of the phrase "a portion of the main counter" favors

7    neither party: on the one hand, the lowered surface is attached to the front of the "main counter"

8    and could plausibly be termed a "portion" of it, but on the other hand, the lowered surface is

9    much shallower than the higher surface.  The regulation's structure, which allows compliance by

10   alternatives and equivalent facilitations, suggests its purpose is to allow flexible yet functional

11   accommodations for disabled passengers, measures that allow them to interact with gate agents

12   on the other side of the counter as would a passenger without a disability.  At an airport gate

13   counter, a passenger can be expected to use the counter's surface to read documents and pass

14   them back and forth, to write notes, and to hold personal belongings, for example.  The lowered

15   surface's shallow depth and placement on the front wall do not allow passengers in wheel chairs

16   or scooters to do these things as a standing passenger would.  Additionally, if a person in a

17   wheelchair uses the lowered surface as intended, the counter's configuration prevents gate agents

18   from seeing her and interacting with her as they would with an able-bodied person.  The lowered

19   surface is therefore not "a portion of the main counter."

20             The Ninth Circuit reached a similar result in *Antoninetti v. Chipotle Mexican Grill,*

21   *Inc.*, 643 F.3d at 1172.  In that case, the defendants operated restaurants with a two-part counter.

22   *See id.*  One part of the counter was a "food preparation counter," and the other part was a

23   "transaction station."  *Id.* at 1169.  Because the food preparation counter and transaction station

24   served different purposes, both the district court and court of appeals agreed they were "different

25   entities, even though they [were] next to each other and adjoined."  *Id.* at 1173.  The transaction

26   station could therefore not be an accessible portion of the whole counter space.  *Id.*  The court

27   also pointed out that in that case a wall separated the customers' side from the employees' side of

28   the food preparation counter.  *Id.*  This wall prevented the plaintiff, who used a wheelchair, from

1   seeing ingredients or watching while the restaurant prepared his food. *Id.* In this way his

2   experience differed from that of standing patrons, and he suffered a disadvantage that customers

3   without disabilities did not suffer. *Id.*

4               Here, unlike in *Antoninetti*, the County's goal is not to provide passengers with a

5   particular experience. *See* 643 F.3d at 1170 ("According to Chipotle, it 'strives to offer a unique

6   experience consisting of the architecture, décor, and music of its restaurants, the aroma of the

7   food, the appearance of a customer's entrée, friendly staff, a tradition of excellent customer

8   service, [the] ability to customize one's entrée, and . . . the taste of the food.'"). But the analogy

9   is nonetheless persuasive. First, the dimensions of the gate counter's lowered surface and its

10   placement on the front of the counter do not allow the counter to serve the same function as the

11   higher, deeper surface. Second, each counter's front panel acts as did the wall in *Antoninetti*,

12   obscuring the view of a passenger in a wheelchair and causing sitting passengers to suffer

13   disadvantages not imposed on standing passengers. Another district court recently reached a

14   similar conclusion when interpreting the phrase "portion of the main counter." *See Salinas v.*

15   *Pac. Castle Newport I, LLC*, No. 14-1233, slip op. at 4–6 (C.D. Cal. Aug. 31, 2015) ("[T]he

16   lower counter is not a 'portion' of the higher counter, and because the higher counter does not

17   meet the requirements of [ADAAG] section 7.2(1), Defendant's Restaurant is non-compliant.").

18               This conclusion withstands the County's argument that changes in the 2010

19   ADAAG show the 1991 ADAAG included no depth requirement. *See, e.g.*, Def.'s Opp'n at 8–9

20   (comparing 28 C.F.R. pt. 36, App. D § 7.2(2) and 28 C.F.R. pt. 1191, App. D § 904.4). The

21   County correctly argues that "omissions are the equivalent of exclusions when a statute

22   affirmatively designates certain persons, things, or manners of operation." *ARC Ecology v. U.S.*

23   *Dep't of Air Force*, 411 F.3d 1092, 1100 (9th Cir. 2005). In other words, the County argues, the

24   omission of a depth requirement embodies the intent to impose none. But "many of the

25   traditional canons have equal opposites." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263 & n.16

26   (1994) (citing Karl Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or*

27   *Canons about How Statutes are to be Construed*, 3 Vand. L. Rev. 395 (1950)). In this case, that

28   equal opposite is the principle that "Congress may amend a statute simply to clarify existing law,"

1    so "an amendment to a statute does not necessarily indicate that the unamended statute meant the

2    opposite." *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994).  Here, the difference

3    between the 1991 and 2010 accessibility standards suggests an intent to clarify at least as

4    persuasively as it suggests a substantive change; that is, the 2010 change could indicate that a

5    "portion of the main counter," was always intended to be just as deep as the main counter.  After

6    all, the ADA's purpose is "to provide a clear and comprehensive national mandate for the

7    elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).

8           The court also concludes the lowered surface is not an "equivalent facilitation."

9    The County explains that a passenger in a wheelchair can pass documents around the side of the

10   gate counter, or the gate agent can walk around the side or to the front of the counter.  *See, e.g.*,

11   Def.'s Mot. 12.  If this were an equivalent facilitation, then almost any counter arrangement could

12   pass muster under section 7.2(2), because an employee and passenger or patron can always walk

13   around or pass documents around a counter.  Neither does this explanation account for the

14   substantially different depths of the lowered surface and main counter.  Regardless of whether the

15   1991 ADAAG included a specific depth requirement, a passenger who can use only the lowered

16   surface has access to a substantially smaller surface area.  *Cf. Antoninetti*, 643 F.3d at 1174 ("The

17   substitutes that Chipotle provided—showing [the plaintiff] samples . . . in serving spoons . . . or

18   assembling the food at the 'transaction station' or at a table in the seating area—do not constitute

19   'equivalent facilitation' because they do not involve 'use of other designs and technologies' or

20   'provide [the plaintiff with] substantially equivalent or greater access to and usability of the

21   facility.'" (quoting 28 C.F.R. § 36, App. A, § 2.2)).

22          Finally, the court finds the discrimination described above was "by reason of" the

23   plaintiffs' disabilities, because they would not have been so disproportionately burdened were

24   they persons without disabilities.   The plaintiffs' motion is granted as to the County's liability

25   under Title II of the ADA for the gate counters, and the County's motion is denied.

26          2.      Section 504 of the Rehabilitation Act

27          Section 504 prohibits discrimination on the basis of a disability "under any

28   program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  A plaintiff

24

1   must show "(1) he is an 'individual with a disability'; (2) he is 'otherwise qualified' to receive the

2   benefit; (3) he was denied the benefits of the program solely by reason of his disability; and

3   (4) the program receives federal financial assistance." *Weinreich v. L.A. Cnty. Metro. Transp.*

4   *Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (emphasis, footnote, and citations omitted).  "There is no

5   significant difference in analysis of the rights and obligations created by the ADA and the

6   Rehabilitation Act."  *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir.

7   1999).  Given the court's conclusion above that the counters do not comply with the ADA's

8   requirements, if the plaintiffs have shown "the program or activity" "receives federal financial

9   assistance," their motion must be granted.

10           The Rehabilitation Act defines "program or activity" broadly to include "all of the

11   operations of . . . [an] instrumentality of a State or of a local government . . . any part of which is

12   extended Federal financial assistance."  29 U.S.C. § 794(b).  This broad definition embodies

13   Congress's rejection of *Consolidated Rail Corp. v. Darrone*, in which the Supreme Court

14   construed the phrase "program or activity receiving Federal financial assistance" to "limit[] the

15   ban on discrimination to the specific program that receives federal funds."  465 U.S. 624, 635–36

16   (1984); *see also Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009).  The statute cannot be

17   interpreted so broadly as to become limitless, however; Section 504 does not "encompass all the

18   activities of the State," but only those "activities of the department or the agency receiving federal

19   funds."  *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002).  A state may therefore avoid

20   section 504 on a "'piecemeal basis'" by "'accepting federal funds for some departments and

21   declining them for others.'"  *Sharer*, 581 F.3d at 1178 (quoting *Jim C. v. United States*, 235 F.3d

22   1079, 1081 (8th Cir. 2000) (en banc)).

23           Here, the County does not dispute that it receives federal financial assistance, but

24   contends the funds received are for programs independent of the construction or operation of

25   Terminal B.  *See* UMF2 nos. 3–6; Def.'s Mot. 12.  For example, the County agrees it received

26   federal funding for the airport's taxiways, runways, baggage handling systems, and

27   environmental impact studies.  UMF2 no. 7.  These distinctions artificially divide the most natural

28   reading of section 504, as amended after *Consolidated Rail*, and the facts of this case.  The court

concludes the County received federal funding for the construction and operation of the Airport, not only for its runways, terminals, or baggage handling system.  It is therefore liable under section 504.

The plaintiffs' motion is granted as to the County's liability for the gate counters under section 504 of the Rehabilitation Act, and the County's motion is denied.

### 3.   California Unruh Act, Disabled Persons Act

Violations of the rights of any person under the ADA are also violations of the Unruh Act, *see* Cal. Civ. Code § 51(f), and the CDPA, *see id.* § 54(c).  The plaintiffs' motion is granted as to the County's liability for the gate counters under these laws, and the County's motion is denied.

### 4.   California Government Code section 11135

"Cal. Gov. Code § 11135 is identical to the Rehabilitation Act except the entity must receive State financial assistance rather than Federal financial assistance."  *D.K. ex rel. G.M. v. Solano Cnty. Office of Educ.*, 667 F. Supp. 2d 1184, 1190–91 (E.D. Cal. 2009); *accord Y.G. v. Riverside Unified Sch. Dist.*, 774 F. Supp. 2d 1055, 1065 n.6 (C.D. Cal. 2011); *compare also* Cal. Gov't Code § 11135(a) ("No person in the State of California shall, on the basis of . . . disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that . . . receives any financial assistance from the state.") *with* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").  For the reasons described above, the court concludes the County received state funding for the construction and operation of the Airport.

The plaintiffs' motion is granted as to the County's liability for the gate counters under Government Code section 11135, and the County's motion is denied.

/////

/////

/////

26

1       B.      <u>Emergency Evacuation Plan</u>

2          1.      <u>Standing</u>

3          The County challenges the plaintiffs' standing to assert any claims based on the

4 emergency evacuation plan. "It goes without saying that those who seek to invoke the

5 jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of

6 the Constitution by alleging an actual case or controversy." *City of L.A. v. Lyons*, 461 U.S. 95,

7 101 (1983). The plaintiff must have suffered an injury in fact. *Lujan v. Defenders of Wildlife*,

8 504 U.S. 555, 560 (1992). This injury must be "both real and immediate, not conjectural or

9 hypothetical." *Lyons*, 461 U.S. at 101–02 (1983) (citations and quotation marks omitted). A

10 plaintiff cannot establish constitutional standing if the proposed harm depends on the occurrence

11 of "contingent future events that may not occur as anticipated, or indeed, may not occur at all."

12 *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations and quotation marks omitted).

13          The injury must also be causally connected to the conduct complained of; it must

14 be "'fairly traceable to the challenged action of the defendant, and not the result of the

15 independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (quoting

16 *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (alterations omitted)). Finally,

17 the relief requested must be "likely" to redress the claimed injury. *Id.* at 561. "The party

18 invoking federal jurisdiction bears the burden of establishing these elements." *Id.*

19          An association such as CFILC has standing to sue on behalf of its members if

20 "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks

21 to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

22 relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash.*

23 *State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The parties dispute only the first element

24 above, that the CFILC's individual members have standing in their own right.

25          Here, the plaintiffs allege the County's emergency evacuation plan currently

26 imposes a disproportionate burden on them, and they allege the County currently makes no

27 reasonable accommodations. They do not complain of potential injuries in a future disaster.

28 Their claims here are immediate: they contend the current plan, the plan the County has already

1    prepared, violates statutes meant to protect people with disabilities from discrimination.  They

2    seek, among other remedies, injunctive and declaratory relief to require the County to modify its

3    plan and eliminate these violations.  Should they achieve these results, their injuries would likely

4    be redressed, because the plans would be adjusted.  Plaintiffs have standing.

5                    2.    Federal Claims

6            As noted above, to establish a violation of Title II, a plaintiff must show "(1) he is

7    a qualified individual with a disability; (2) he was either excluded from participation in or denied

8    the benefits of a public entity's services, programs, or activities, or was otherwise discriminated

9    against by the public entity; and (3) this exclusion, denial, or discrimination was by reason of his

10   disability."  *Cohen*, 754 F.3d at 695.  The court has concluded above that the plaintiffs have

11   established the County received federal funding in the operation of the Airport and Terminal B,

12   and therefore the plaintiff's ADA claims merge with their Rehabilitation Act claims.  *See*

13   *Weinreich*, 114 F.3d at 978; *Zukle*, 166 F.3d at 1045 n.11.  Here, as above, the parties agree the

14   plaintiffs are qualified individuals with disabilities or advocate on behalf of qualified individuals

15   with disabilities, and only the second and third elements remain in dispute.

16           The ADA "applies with equal force to facially neutral policies that discriminate

17   against individuals with disabilities."  *Cmtys. Actively Living Indep. & Free v. City of L.A.*

18   *(CALIF)*, No. 09-0287, 2011 WL 4595993, at *12 (C.D. Cal. Feb. 10, 2011) (citing *McGary v.*

19   *City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004)).  "[T]o challenge a facially neutral

20   government policy on the ground that it has a disparate impact on people with disabilities, the

21   policy must have the effect of denying meaningful access to public services."  *K.M. ex rel. Bright*

22   *v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1493

23   (2014), *and cert. denied sub nom. Poway Unified Sch. Dist. v. D.H. ex rel. K.H.*, 134 S. Ct. 1494

24   (2014).  A policy may deny meaningful access by imposing a disproportionate burden on the

25   disabled.  *See Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).  When a state's polices

26   /////

27   /////

28   /////

1  discriminate in violation of the ADA, the state must make reasonable modifications[14] to avoid the

2  discrimination.  *Id.* (citing 28 C.F.R. § 35.130(b)(7)).

3        A person may also sue independently for a reasonable accommodation.  *McGary*,

4  386 F.3d at 1259.  "A plaintiff need not allege either disparate treatment or disparate impact in

5  order to state a reasonable accommodation claim."  *Id.*  Here, the plaintiffs raise claims both

6  arising from allegedly disproportionate burdens and a failure to provide reasonable

7  accommodations.

8        Two federal district courts have concluded that a municipal government may

9  violate the ADA and related state law by adopting emergency evacuation plans that

10 disproportionately burden the disabled.  *See generally CALIF*, 2011 WL 4595993; *Brooklyn Ctr.*

11 *for Indep. of Disabled v. Bloomberg (BCID)*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013).

12       In *CALIF*, the plaintiffs alleged they had suffered discrimination as a result of their

13 disabilities[15] because Los Angeles's emergency evacuation plan did not address their unique

14 needs.  2011 WL 4595993, at *1.  The court agreed the City's emergency preparedness plan was

15 a governmental program within the scope of the ADA and the Rehabilitation Act.  *Id.* at *13.  The

16 court also agreed the plan denied meaningful access to individuals with disabilities because it

17 "fail[ed] to address or provide for their unique needs."  *Id.*  The court granted the plaintiffs'

18 motion for summary judgment because they showed the plan included no provisions to "notify

19 people with auditory impairments or cognitive disabilities of an emergency" or to "evacuate,

20 transport, or temporarily house individuals with disabilities during or immediately following an

21 emergency or disaster."  *Id.*  For example, the City planned to provide mass shelter and care for

22  

23       [14] The terms "reasonable modification" and "reasonable accommodation" are interchangeable here.  *See McGary*, 386 F.3d at 1266 n.3.

24       [15] In *CALIF*, the plaintiffs were an individual who suffered from a congenital condition

25 that required her to use a wheelchair and a "private, non-profit community-based corporation providing advocacy, resources, and individualized assistance to people with disabilities."  *Id.*

26 at *11.  The defendant also stipulated that these plaintiffs would be designated as class representatives of "all people with disabilities, as defined by the ADA" who are within the City

27 and the jurisdiction served by the City's and County's emergency preparedness programs and services."  *Id.*

28

1   residents forced to evacuate their homes, but the City did not know which of the 200 or so shelter

2   sites identified were accessible to people with disabilities.  *Id.* at *14.  The court rejected the

3   City's argument that it could "make *ad hoc* reasonable accommodations upon request" because

4   "[t]he purpose of the City's emergency preparedness program is to anticipate the needs of its

5   residents in the event of an emergency and to minimize the very type of last-minute,

6   individualized requests for assistance."  *Id.*

7          In *BCID*, the plaintiffs pled ADA, Rehabilitation Act, and related non-federal

8   claims against the City of New York, largely along the same lines as the *CALIF* plaintiffs.  *See*

9   980 F. Supp. 2d at 595–97.  In a detailed, post-bench-trial order, the court concluded the plaintiffs

10  had established the City's liability for several of their claims.  For example, the City had not

11  prepared a viable plan for evacuating people with disabilities from multi-story buildings, had not

12  ensured the availability of accessible transportation during an emergency, had not planned to

13  provide accessible emergency shelters to people with disabilities, and its communication plans

14  before and during emergencies did not ensure people with disabilities could obtain the

15  information they needed.  *See id.* at 643–56.

16         Here, the plaintiffs fault three aspects of the County's plans.  First, they argue the

17  plans do not sufficiently address the evacuation of people with mobility disabilities because

18  (a) the County does not plan how to evacuate them from the people mover; (b) the County does

19  not adequately plan how to evacuate them down stairways; (c) the County's plans generally do

20  not identify and address their specific needs.  Second, they argue the County's signs and overhead

21  paging system do not communicate enough information to allow them to understand what to do

22  and where to go in an emergency, for example where the accessible emergency exits are, where

23  stair chairs are, and where to go for help.  Third, they argue the County's plans include no

24  provisions to ensure (a) they can be transported away from the airport if necessary; (b) they will

25  be recovered and returned to the Terminal after an evacuation; and (c) they will be reunited with

26  their durable medical equipment, including wheelchairs.

27  /////

28  /////

a)      Exclusion from Physical Evacuation Plan

The County has not shown its plans to evacuate the people mover comply with the ADA and Rehabilitation Act.  To evacuate the people mover, passengers must use a pathway that wheelchair users cannot navigate without assistance.  Neither has the County presented evidence it has trained its staff or anyone else to evacuate people with mobility disabilities from the people mover.  The County's plan therefore disproportionally burdens passengers with mobility disabilities.

As for Terminal B in general, the County has presented evidence of its plan to evacuate people with mobility disabilities, if necessary with assistance, over pedestrian bridges and down stairs and elevators.  The undisputed evidence shows the County has designated specific locations in stairwells and near emergency exits as places for people with mobility disabilities to await assistance.  The parties also agree the County has anticipated the need to transport people with mobility disabilities down stairways with stair chairs and on level surfaces with wheelchairs, aisle chairs, and gurneys.  Its staff and first responders know where to find them.

In *BCID*, the Southern District of New York persuasively reasoned the "ADA does not . . . require perfection."  980 F. Supp. 2d at 641 (quoting *United Spinal Ass'n v. Bd. of Elections*, 882 F. Supp. 2d 615, 624 (S.D.N.Y. 2012)); *see also* 28 C.F.R. § 35.150(a) ("A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.").  The evidence described in the previous paragraph shows the County's plan, in this limited respect, does not deny the plaintiffs meaningful access to evacuation services.  The County has made plans to ensure people who cannot evacuate alone will receive assistance.

In other respects the County's plan inadequately accounts for the specific needs of disabled patrons.  The County has not taken surveys of the likely number of mobility disabled passengers to test its supply of stair chairs, wheel chairs, and gurneys.  Given the County's plans to rely on these devices, it must also plan to have enough of them on hand.  The County also plans for disabled patrons to wait on first responders and expects first responders to make

1    individual judgments, but the County has not shown these first responders receive training

2    specific to transporting people with disabilities.  Neither has the County shown it specifically

3    reserves personnel to assist the disabled in evacuations.  The County does not violate the ADA or

4    the Rehabilitation Act by planning to rely on the discretion of first responders, but it cannot rely

5    on this discretion without also ensuring some first responders have both received appropriate

6    training and are designated to seek out and assist the disabled.  The County must undertake efforts

7    to anticipate the specific needs of people with mobility disabilities, train its personnel to

8    recognize and avoid common missteps, reduce the risk of errors, and avoid the dangers associated

9    with the chaos of a true emergency.  *See CALIF*, 2011 WL 4595993, at *14 (finding a public

10   entity may not plan to make "*ad hoc* reasonable accommodations upon request" when its

11   emergency preparedness program is designed to "anticipate the needs of its residents in the event

12   of an emergency" and "minimize . . . last-minute, individualized requests for assistance").

13             The County's motion and the plaintiffs' motion are therefore each granted in part

14   and denied in part as described above.

15                          b)        Exclusion from Communication Plan

16             The County has not shown it is entitled to judgment as a matter of law that its

17   communication plan complies with the ADA and Rehabilitation Act.  It has provided no evidence

18   of plans to communicate the locations of accessible emergency exits, stair chairs, or other

19   emergency evacuation devices when an emergency rises, and it has provided no evidence of plans

20   to tell people with mobility disabilities who will help them or where to wait for help.  By

21   providing specific plans for communications to the general public but not to the mobility

22   impaired, the county's plans disproportionately burden people with disabilities.

23                          c)        Exclusion from Recovery Plan

24             The plaintiffs have presented undisputed evidence that the County plans to relocate

25   the general public to areas that are comfortable and convenient but has not anticipated the unique

26   needs of people with mobility disabilities after evacuation.  The County also has planned to

27   recover and return the general public to the airport, but has not planned specifically for recovering

28   and returning people with mobility disabilities.  Although the County has ADA-accessible

vehicles, it has presented no evidence of its efforts to ensure it will have enough when needed. The County has made no plans to ensure people who depend on durable medical equipment will be reunited with their equipment, and it has made no plans to provide appropriate substitutes or accommodations for a person away from the Airport and without his or her equipment.

d)    "By Reason of the Disability"

The undisputed evidence shows that in each instance described above, the plaintiffs' exclusion was "by reason of" their disability. As in *CALIF*, the County's emergency preparedness plan is intended as a general and comprehensive plan to benefit the general public, but its features do not adequately anticipate and account for the plaintiffs' needs as people with disabilities. *See* 2011 WL 4595993, at *14. Airport patrons without disabilities face none of the same shortcomings, and the plaintiffs have therefore shown they are disproportionately vulnerable in an emergency. The parties' motions are therefore granted in part and denied in part as described above.

3.    California Claims

As described above, violations of the rights of any person under the ADA are also violations of the Unruh Act, Cal. Civ. Code § 51(f), and the CDPA, *id.* § 54(c). Likewise, the court concluded above that California Government Code section 11135 imposes the same burden as section 504 of the Rehabilitation Act, and that the County received state funding in the construction and operation of the Airport and Terminal B. The parties' motions are therefore granted in part and denied in part to the same extent as described in the previous section.

V.    CONCLUSION

This order disposes of ECF Nos. 37, 43, and 54. The plaintiffs' motion for partial summary judgment is GRANTED IN PART and DENIED IN PART; the County's motion for partial summary judgment is likewise GRANTED IN PART and DENIED IN PART:

(1)    With respect to the gate counters, the plaintiffs' motion is granted, and the County's motion is denied;

(2)    With respect to the emergency evacuation plan, the court orders as follows for each claim, state and federal:

33

1          (a)      The plaintiffs' motion is granted and the County's motion is denied with

2                        respect to the automated people mover evacuation plan, the plan for

3                        communications during an emergency, and recovery plan as described in

4                        this order; and

5          (b)      Both parties' motions are granted in part and denied in part with respect to

6                        the County's plans for actual physical evacuation of the terminal as

7                        described in this order.

8          IT IS SO ORDERED.

9    DATED:  November 3, 2015.

10

11    _____

12          UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28